**Andrew A. DOWNS and Maria Downs, Plaintiffs,**

**v.**

**PERSTORP COMPONENTS, INC. and ICI Americas, Inc., Defendants.**

No. 3:96–CV–597.

United States District Court,
E.D. Tennessee
at Knoxville.

Dec. 27, 1999.

Carl R. Ogle, Jr., Law Offices of Carl R. Ogle, Jr., Jefferson City, TN, for Andrew A Downs, Maria Downs.

Harry P Ogden Lewis, King, Krieg, Waldrop & Catron, P.C., Knoxville, TN, for Perstorp Components, Inc.

J Randolph Bibb, Jr, Baker, Donelson, Bearman & Caldwell, Nashville, TN, Stephen E Embry, Brown Todd & Heyburn PLLC, Louisville, KY, John W Hays, Brown Todd & Heyburn PLLC, Lexington, KY, for ICI Americas, Inc.

### MEMORANDUM AND ORDER

PHILLIPS, United States Magistrate Judge.

An order of reference was entered in this case on September 27, 1999, referring to the undersigned, for consideration and disposition pursuant to 28 U.S.C. § 636(b) and the rules of this court, the motion in limine filed by defendants seeking to exclude the testimony of plaintiff's expert, Kaye H. Kilburn, M.D. [Doc. 36]. The parties were further ordered to appear before the undersigned for a *Daubert*[1] hearing on October 1, 1999 [Doc. 67]. Previously, defendant ICI Americas, Inc.'s motion for recovery of costs [Doc. 59] had been referred to the undersigned for appropriate disposition [Doc. 61]. A *Daubert*/evidentiary hearing was held on both of these motions on October 1, 1999, at which time testimony was presented by both plaintiff and this defendant.

---

1. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

## I.

### STATEMENT OF FACTS

On October 11, 1995, Jayne Collyar of Perstorp Components gave dimensions of some freight to JoAnn Holland, an employee of SurfAir, Inc., that Ms. Collyar needed shipped to Perstorp's factory on October 11, 1995. Ms. Collyar needed the freight because the trucker who was going to drive the freight to her had to be down for eight hours because he was out of drive time. The dimensions that Ms. Collyar gave Ms. Holland were wrong, thus making the size of the plane that was chartered by SurfAir to deliver the freight to be the wrong size.

Upon finding that the freight container would not fit on the plane, the Perstorp employee, Jayne Collyar, suggested that the freight be broken down into smaller containers so that a portion of the chemical could get to Perstorp's factory. Ms. Holland spoke to the plaintiff, Andrew Downs, about the problem, and Ms. Holland and Mr. Downs decided that Mr. Downs would purchase containers from Wal–Mart in Jefferson City, Tennessee, and plaintiff would drive to the airport in Knoxville to transfer the product. Plaintiff was concerned about the safety of breaking the seal on the shipment and exposing himself to the chemical because there was a 1–800 number on the freight that he was supposed to call in case of a spill and he was concerned that the material might be classified as hazardous.

During a conversation with Jayne Collyar of Perstorp a short period after her conversation with Mr. Downs, Ms. Holland asked Ms. Collyar what the product was. Ms. Collyar related that the product was named Rubiflex, and Ms. Holland looked in her HazMat book but could not find the name Rubiflex cross-referenced in any way. She relayed this message to Mr. Downs, and he proceeded to transfer the product. Mr. Downs subsequently called Ms. Holland back and said that the transfer was not working. He was spilling more than he was getting into the containers, he had the chemical on him, and he was concerned. He wanted Ms. Holland to make sure it was safe and related to Ms. Holland that his skin was burning somewhat. Ms. Holland called Ms. Collyar once again and relayed Mr. Downs' concerns to Ms. Collyar, and Ms. Collyar stated that Rubiflex would not hurt Mr. Downs. She stated that, "People come in contact with this everyday; they have had it on them from head to toe and it hasn't bothered anyone." Ms. Holland called plaintiff back and told him what Ms. Collyar had said. Mr. Downs related that he was going home to take a shower. Ms. Collyar canceled the charter that day, stating that she would transport it herself [Doc. 16, Affidavit of JoAnn Holland attached].

Plaintiff, Andrew Downs, was employed by Dodson International Air, an air charter company. Plaintiff was originally treated by Dr. William A. Paulsen, a neurologist, who did not find that plaintiff sustained a neurological injury. Plaintiff was then examined by Dr. Kaye H. Kilburn, M.D., who diagnosed the plaintiff with "chemical encephalopathy which includes paresis (paralysis) of the right seventh cranial nerve and hyperesthesia face supplied by the fifth cranial nerve and visual field losses that are worse on the right. Also included is ptosis (eyelid droop) on the right. Body balance, reaction time and recall-short term memory was (sic) also impaired as measured by comparison to predicted values adjusted for his age, education, sex, height, and other factors." Rule 26(a)(2) report of Kaye H. Kilburn, M.D., attached as "Exhibit A" to plaintiff's memorandum in support of its response to motion in limine to exclude testimony of plaintiff's expert, Kaye H. Kilburn, M.D. [Doc. 47].

Dr. Kilburn further states in his report dated July 28, 1998, that these signs of brain damage followed a single exposure to Rubiflex containing (DETA) diethyltoluene diamine, a polyurethane polymer system by contact and inhalation in October 1995. Imaging by D. James S. Lim, Dr. Kilburn

states, showed no abnormality of the Circle of Willis and posterior fossa of the skull and brain area. Magnetic brain and neck scans on January 2, 1996 showed no abnormalities. Spinal fluid examination was normal, and there was no history of other chemical exposures possibly competing to cause the impairment found. There was no history of pre-existing or spontaneous neurological disease or impairment. In summary, Dr. Kilburn states, in the process of differential diagnosis that he applied in Mr. Downs, no alternate factors nor additional considerations were found.

Dr. Kilburn concludes that patient Andrew A. Downs, who was well and healthy, had a single skin contact and inhalational exposure to Rubiflex in October 1995 that was followed in a logical sequence by injury consisting of severe facial pain, sensory abnormalities, visual field losses, impaired balance, slowed reaction time and recall-memory ·impairment. As other possible causes have been eliminated, Dr. Kilburn opined, it is concluded that the chemicals in the Rubiflex are responsible and Dr. Kilburn's expert opinion was offered to the standard of more likely than not.

Dr. Kilburn is Ralph Edington Professor of Medicine at the University of Southern California School of Medicine, he is editor and chief of the Archives of Environmental Health and has published over two hundred scientific papers [Doc. 47, Exhibits A & D].

## II.

### POSITIONS OF THE PARTIES

#### A. Defendants' Assertions[2]

In their motion in limine, defendants have moved to exclude the testimony of Dr. Kilburn, asserting that Dr. Kilburn's opinions do not satisfy the legal requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and asserting that he is not qualified to testify

about ICI's product [Doc. 36]. In its memorandum in support of their motion in limine, defendants point out that Dr. Kilburn has been excluded from testifying in at least six other toxic tort cases, and his opinions have been rejected in a seventh. *Nelson v. Tennessee Gas Pipeline Company*, No. 95–1112, 1998 WL 1297690 (W.D.Tenn. August 31, 1998) (excluded); *Lofgren v. Motorola*, No. CV 93–05521, 1998 WL 299925 (Ariz.Sup.Ct. June 1, 1998) (excluded); *Goeb v. Tharaldson*, No. C3–92–602051 (St. Louis County, Minn. February 4, 1998) (excluded); *Valentine v. Pioneer Chlor Alkali, Inc.*, 921 F.Supp. 666, 673–74 (D.Nev.1996) (excluded); *Horne v. Pioneer Chlor Alkali Co., Inc.*, NO. CV–S–93–1060 HDM (D.Nev. March 4, 1996) (excluded); *Thomas v. FAG Bearings Corp., Inc.*, 846 F.Supp. 1400 (W.D.Mo.1994) (excluded); *Georgine v. Amchem Products, Inc.*, 157 F.R.D. 246 (E.D.Pa.1994) (rejected).

Dr. Kilburn's testimony was excluded or rejected in these actions, defendants assert, because the courts determined that his methodology was unscientific. Defendants offer the following language taken from these decisions to illustrate this fact:

- "Dr. Kilburn's deposition testimony and portions of his written work submitted by Tenneco suggest that he is a strong opponent of the use of chemicals. Expert opinions are about science, however, not advocacy. Based on the entire record in this case, Dr. Kilburn's studies suffer from significant methodological flaws. Moreover, his opinions are completely unsupported by any scientific research outside the litigation context.... Dr. Kilburn's opinions are based upon nothing more than conjecture, speculation, and litigation animus." *Nelson*, at 16.

- "Dr. Kilburn's 'revolutionary hypotheses' appear to be supported by nothing

---

**2.** Defendant Perstorp Components, Inc., pursuant to Rule 10(c), Federal Rules of Civil Procedure, adopted and incorporated by reference the motion in limine to exclude the

expert opinions of Dr. Kilburn and the reply memorandum supporting motion in limine filed by its co-defendant, ICI Americas, Inc., [Docs. 42, 50].

more than supposition, hunches, and selective reliance on studies." ... His "methodologies utilized in this case do not appear to be accepted by the medical or scientific community." Dr. Kilburn's "conclusion appeared to be more litigation-driven than science oriented." *Lofgren*, at 32, 52–54.

- "Dr. Kilburn's method is contrary to generally accepted scientific practice, is not generally accepted, and, in addition, is not scientifically reliable for purposes of determining such a cause and effect relationship. Dr. Kilburn's proffered opinion here is based on speculation and conjecture by reason of the fact that he did not apply a generally accepted scientific method to determine whether exposure of the plaintiffs to Dursban and its components was capable of causing the injuries which are here claimed." *Goeb*, at 4.

- "Dr. Kilburn's study suffers from very serious flaws.... As a result, his conclusions ... cannot be said to be derived from acceptable scientific methodology." *Valentine*, 921 F.Supp. at 678.

- "The significant problem with Dr. Kilburn's methodology is that ... it does not appear to provide a scientific basis for his conclusions regarding causation.... [I]t appears that Dr. Kilburn's testimony as to causation is based on little 'more than subjective belief or unsupported speculation,' which is not 'scientific knowledge.'" *Horne*, at 19 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).

- In Georgine, Dr. Kilburn described a proposed class action settlement agreement as "lousy, reprehensible, and diabolically cunningly designed document to take the rights and privileges away from the asbestos-exposed workers of America." The court rejected Dr. Kilburn's testimony, finding that it was "a diatribe ... [that] appeared immoderate and contrary to the weight of the scientific evidence

and therefore unpersuasive." *Georgine*, 157 F.R.D. at 271.

Dr. Kilburn's methodology and proffered opinions in this case suffer from the same fatal defects, defendants assert, because his methodology ignores generally accepted methods of toxicology, and offers instead predetermined conclusions based upon Dr. Kilburn's subjective beliefs and unsupported speculation.

Defendants point out that plaintiff, as the party seeking to have Dr. Kilburn's testimony admitted, has the burden of showing that Dr. Kilburn's "findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir.1997), *cert. denied*, 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997). Moreover, defendants assert, plaintiff cannot meet this burden with bald assurances of validity from Dr. Kilburn.

In many toxic tort cases, defendants point out, the central issue in dispute is whether a particular chemical substance caused the plaintiff's alleged injuries. *Cavallo v. Star Enterprise*, 892 F.Supp. 756, 757 (E.D.Va.1995), *affirmed in part, reversed in part on other grounds*, 100 F.3d 1150 (4th Cir.1996), *cert. denied*, 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998). Toxicology is the relevant scientific discipline employed to determine whether a chemical substance is capable of causing and has caused adverse biological effects, defendants state, and classically it is known as the science of poisons. Federal Judicial Center, Reference Manual on Scientific Evidence (1994).

Defendants further point out that the generally accepted method for conducting a toxicological investigation consists of identifying the source, exposure, dose, and medical condition. The source of the chemical in issue must be identified, there must be an opportunity for physical contact with the chemical, and

the amount of the chemical to which the individual is exposed must actually penetrate a portal of entry. If exposure occurs and a dose is received, and if the dose is of sufficient magnitude, the effect may be beneficial, or it may cause a compatible medical condition such as a sign, symptom, abnormal laboratory finding, or diagnosed disease. Only if these four steps of a toxicological investigation are complete, defendants state, can the expert turn to the issue of causation. In most toxic exposure cases, two different but interrelated analyses must be performed, that is, a general causation analysis and a specific causation analysis. Numerous courts have recognized that both analyses must be performed in toxic tort cases, defendants assert, citing relevant authorities. To establish general causation, an expert either performs scientific tests on the chemical to see if it can cause the condition in animals or humans, analyzes the existing scientific literature to determine whether other scientists have performed these tests and what their results were, or does both. To establish specific causation, an expert must first complete the general causation analysis, and then must establish, at a minimum:

- **Qualitative Toxicity.** The chemical in issue is known to be capable of producing the alleged effect in humans. In some instances, animal data or other information may be applied to the analysis and the biologic plausibility of such extrapolation must be evaluated in this assessment. [This is essentially the results of the general causation analysis.]
- **Dose–Response.** The individual had contact with the chemical (exposure), and the amount of chemical absorbed into the body (dose) was of sufficient magnitude and duration to be capable of producing the alleged effect.
- **Temporality.** The chemical exposure must be related in time to the onset of the individual's clinical condition, e.g., the effect did not precede the alleged exposure.

- **Confounders.** All other significant causes (including exposure to other substances, lifestyle, workplace, and genetic factors) of the individual's clinical condition have been controlled for or ruled out. This is essentially the same procedure a physician performs when conducting a differential diagnosis.
- **Coherence.** All of the evidence is consistent with the conclusion of causation.

Failure to establish even one of these criteria for specific causation is usually fatal to the proposition that exposure to a specific chemical caused a specific medical condition, i.e., individual causation. In this case, defendants assert, plaintiff must show that Dr. Kilburn's proffered opinions resulted from his correct application of generally accepted methods of toxicology. If Dr. Kilburn did not use generally accepted methods to form his opinions, if he failed to apply the methods appropriately, or, if his opinions widely diverge from those generally accepted in the field of toxicology, his opinions do not constitute scientific knowledge and are inadmissible under Rule 702, Federal Rules of Evidence.

Citing to Dr. Kilburn's Rule 26 report (attached as Exhibit D to Doc. 45), defendants point out that Dr. Kilburn concluded that it is more likely than not that plaintiff's physical impairments were caused by a "single skin contact and inhalational exposure to Riboflex (sic) in October 1995." When asked what process he went through to form his opinions in his Rule 26 report, he testified that he examined and elicited information from Andrew Downs concerning both how he felt, what he had been exposed to, what his medical neurological history was, and then put him through about five or six hours of testing of his neurobehavioral functions working with things which are in the list of studies and tests carried out on page 5 of his report of February 16, 1996. [Kilburn Depo. at 18, Doc. 45, Exhibit E]. Noticeably absent

from Dr. Kilburn's description of his "methodology", defendants point out, is any inquiry about: (1) the chemical composition of Rubiflex; (2) whether plaintiff received a dose of Rubiflex; (3) whether the dose (if any) was sufficient to cause an effect in humans; (4) whether Rubiflex or any of its components was capable of causing the symptoms Downs reported; (5) whether Rubiflex or its components in fact caused Downs' symptoms; or (6) whether Downs' prior medical, educational or occupational records suggested alternative causes of his symptoms.

Defendants further assert that before forming his opinions in this case, Dr. Kilburn did not review any of plaintiff's prior medical, educational or occupational records, reviewed at least one Material Safety Data Sheet ("MSDS") concerning the composition of Rubiflex, and also received some MSDSs in April 1996. When asked in his deposition about the components of Rubiflex, and their corresponding MSDSs, Dr. Kilburn replied, "I haven't tried going through these MSDSs to see how they line up." And when asked if he thought that a curing agent in Rubiflex caused plaintiff's problems, Dr. Kilburn responded, "I don't think there is any way to separate from the material that he handled to its components to make attribution of what caused his impairment, disability other than it was the exposure to the Rubiflex." [Kilburn Depo. at 19–24; Doc. 45, Exhibit E].

Dr. Kilburn did review a questionnaire that plaintiff had completed about his symptoms and had plaintiff take several neuropsychological tests of his memory, recall, cognitive function, balance and vision. Dr. Kilburn also performed a physical examination of plaintiff which included pulmonary function tests [Kilburn Depo. at 18, 27, 35; Exhibit 45, Exhibit E].

Defendants assert further that nothing in Dr. Kilburn's 1996 report indicates that he performed any search of the medical or scientific literature before forming his opinions, but sometime after he examined plaintiff, Dr. Kilburn searched the medical and scientific literature for references to Rubiflex but did not find any [Kilburn Depo. at 127; Doc. 45, Exhibit E]. The only specific reference to the scientific literature in Dr. Kilburn's Rule 26 report, defendants point out, relates to the pulmonary effects of isocyanates, primarily toluene diisocyanate ("TDI"), but Dr. Kilburn admitted that he is not aware of any evidence that Rubiflex contains TDI [Kilburn Depo. at 141–42; Doc. 45, Exhibit E]. In fact, defendants state, it does not [Rule 26 report of James P. Lyon, Ph.D.; Doc. 45, Exhibit G]. When Dr. Kilburn was asked if he knew how much exposure to Rubiflex was necessary to cause plaintiff's injuries, he replied, "No, I don't. He got enough. And that's pharmacologically the principle. The dose is the amount that does the job." [Kilburn Depo. at 159; Doc. 45, Exhibit E].

Based upon these facts, defendants state, Dr. Kilburn's opinions do not comport with the Supreme Court's standards set forth in *Daubert* because his opinions are not based upon good science or scientific knowledge. Rather, defendants assert, Dr. Kilburn's opinions are merely based upon speculation and his advocacy for the plaintiff. Defendants assert that Dr. Kilburn's opinions can be tested, but he has not done so. His failure to test his theory leaves it as nothing more than a hypothesis, defendants assert, and even assuming that the examinations and tests administered by Dr. Kilburn revealed abnormal findings, Dr. Kilburn does not contend that they are capable of identifying the specific cause of the abnormalities. Defendants assert further that Dr. Kilburn's opinions are not based on published, peer reviewed literature. Nowhere in Dr. Kilburn's reports does he mention any articles or treatises to support his theory that a single exposure to Rubiflex can cause chronic neurological impairment. The only specific reference made by Dr. Kilburn to scientific literature in his Rule 26 report, defendants point out, related to the pulmonary effects of exposure to isocyanates, primarily TDI. Dr. Kilburn is not aware of any evidence that Rubiflex contains TDI, and

since the article cited by Dr. Kilburn in his report does not relate to Rubiflex or to the brain or central nervous system, Dr. Kilburn cannot properly extrapolate the findings reported in that article to his hypothesis.

Relying upon the decision of the United States District Court for the Western District of Tennessee to support defendant's assertion that Dr. Kilburn's opinion should be rejected, defendants point to the language of the *Nelson* decision that, "[c]ourts have found that extrapolation from studies of chemicals different from those at issue does not rise to the level of accepted methodology." *Nelson*, at 13 (*citing Schudel v. General Electric Co.*, 120 F.3d 991, 996–97 (9th Cir.1997)). The *Nelson* court also found, defendants point out, that "[e]xperts may not rely on studies that do not address the types of diseases at issue." *Id.* at 14 (*citing Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1115–16 (5th Cir.1991), *abrogated on other grounds, Daubert; Valentine*, 921 F.Supp. at 673–74). *See also, Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 197 (5th Cir.1996) (studies suggesting that chemical exposure causes lymphatic and hematopoietic cancer not probative to cause of brain cancer); *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119, 1122 (N.D.Ill.1995) (rejecting studies about eye irritation in rabbits to pulmonary or respiratory conditions in humans).

Defendants further assert that Dr. Kilburn's opinions are not based on standards having a known or potential rate of error, asserting that there is no way to analyze Dr. Kilburn's opinions or his methodology, because he does not use the methods and techniques of good science to form his opinions. Moreover, defendants assert, Dr. Kilburn's opinions are not generally accepted.

Examining Dr. Kilburn's opinions as they relate to causation, defendants point out that Dr. Kilburn cannot identify a single scientific test, study, experiment or authority of any type to support his opinions that a single exposure to Rubiflex can cause chronic neurologic impairment or that it did in this case. His opinions are not generally accepted by the toxicological community, and he has not produced any evidence that his opinions have been considered by anyone else in that community.

Moreover, defendants assert, Dr. Kilburn's temporal causation theory is based on a logical fallacy. Defendants assert that the core of Dr. Kilburn's methodology can be found in his Rule 26 report and in two of his deposition answers. In his Rule 26 report, Dr. Kilburn related that plaintiff, who was well and healthy, had a single skin contact and inhalational exposure to Rubiflex in October 1995 that was followed in a logical sequence by injury. When asked in his deposition about the dose of Rubiflex necessary to cause plaintiff's injuries, Dr. Kilburn testified that, "he got enough." When asked to identify the evidence to support his claim that Rubiflex is toxic, Dr. Kilburn testified that, "I have Andrew Downs." [Kilburn Depo. at 158–59; Doc. 45, Exhibit E].

■ These statements, taken together, defendants assert, reveal that Dr. Kilburn's methodology is a classic example of the logical fallacy of arguing from temporal sequence to a causal relation. As pointed out by the court for the Northern District of Illinois in *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119 at 1122, "It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed.R.Evid. 702." *See also, Conde v. Velsicol Chemical Corp.*, 804 F.Supp. 972, 1023 (S.D.Ohio 1992), *aff'd,* 24 F.3d 809 (6th Cir.1994); *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 611 (7th Cir.1993); *Cuevas v. E.I. DuPont De Nemours and Co.*, 956 F.Supp. 1306, 1310–11 (S.D.Miss.1997); *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900, 906 (M.D.Fla.1996); *Cavallo v. Star Enterprise*, 892 F.Supp. 756, 757 (E.D.Va.1995), *affirmed in part, reversed in part on other grounds,* 100 F.3d 1150 (4th Cir.1996), *cert.*

*denied,* 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998).

Defendants assert further that Dr. Kilburn does not identify the chemical substances that he claims caused plaintiff's injuries, he does not identify the dose plaintiff received from his exposure to Rubiflex or the dose/response relationship for Rubiflex, and his opinions provide no assessment of general causation. As a matter of law and good science, defendants state, a toxicological inquiry must include an assessment of whether the chemical(s) in issue are capable of causing the effects in issue. Without this data, defendants reason, the toxicologist cannot establish a general causation as required by law and generally accepted methods of toxicology.

If general causation cannot be determined, defendants point out, specific causation cannot be determined either. Dr. Kilburn had no experience with Rubiflex prior to seeing plaintiff, and he cannot rely upon his experience to support his proposition that a single exposure to Rubiflex can cause chronic neurological impairment, and Dr. Kilburn has not located any support for his proposition in the relevant scientific and medical literature [Kilburn Depo. at 127, 138; Doc. 45, Exhibit E]. Dr. Kilburn testified in his deposition that Rubiflex is an "epoxy-type product," but defendants point out that Dr. Kilburn's experience with epoxy exposure is limited to five other patients he has seen [Kilburn Depo. at 127; Doc. 45, Exhibit E]. Even assuming that Dr. Kilburn could properly use information about the health effects of epoxy to draw conclusions about the effects of Rubiflex, defendants point out that Dr. Kilburn's attempt to use a few case studies of epoxy to prove that Rubiflex can cause neurological impairments is a classic example of another logical fallacy—the Converse accident (hasty generalization). *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1391 (C.D.Ill.1992). The fallacy of Converse accident occurs when a person erroneously creates a general rule from observing too few cases. *Id.* at 1395.

Pointing to the opinion of the Ninth Circuit Court of Appeals in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (*"Daubert II"*), defendants quote from the opinion of the Ninth Circuit on remand: "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Defendants admit that Dr. Kilburn began researching the general topic of chemical brain injury before he saw plaintiff in February of 1996, but further assert that much of Dr. Kilburn's research has been litigation driven and funded by monies received from plaintiffs and law firms that represent plaintiffs. In fact, defendants point out, Dr. Kilburn devotes an entire chapter of his book *Chemical Brain Injury* to "Legal Proceedings." Kaye H. Kilburn, *Chemical Brain Injury,* pp. 352–63 (1998). Defendants further observe that other courts that have excluded Dr. Kilburn's opinions have noted that his opinions did not grow naturally and directly out of prelitigation research. *Nelson,* at 15–16; *Lofgren,* at 54; *Valentine,* 921 F.Supp. at 670.

Last of all, defendants assert that Dr. Kilburn is not qualified to give an opinion about Rubiflex. Defendants assert that although Dr. Kilburn has a lengthy resume, his education, training and experience do not provide him with the requisite qualifications to testify about Rubiflex or its alleged effects on the human brain. In assessing Dr. Kilburn's qualifications to testify in this case, this court must determine "whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser,* 105 F.3d at 305 (*quoting Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994)).

The specific question before this court is whether a single exposure to Rubiflex can cause chronic neurologic impairment. Defendants conclude that Dr. Kilburn is not

qualified to answer this question because: (1) he did not have any experience with Rubiflex prior to examining Downs; (2) he does not know what levels of exposure to Rubiflex are dangerous to humans; and (3) he cannot refer to any support in the medical or scientific literature for his testimony about Rubiflex. For similar reasons, defendants state, the trial court in *Mancuso* found that the plaintiff's expert did not possess the "requisite qualifications to testify that plaintiff's ailments were caused by exposure to PCBs, even under the lenient standards of Rule 702." *Mancuso*, 967 F.Supp. at 1443–45. Therefore, defendants state, considering all of the flaws and fallacies of Dr. Kilburn's opinions and methodology, Dr. Kilburn's opinions are about speculation and advocacy, not science. Under *Daubert*, therefore, Dr. Kilburn's testimony that Rubiflex caused plaintiff's alleged injuries must be excluded [Doc. 45].

### B. Plaintiff's Response

Plaintiffs have responded in opposition to defendants' motion in limine to exclude the testimony of plaintiffs' expert witness, Kaye H. Kilburn, M.D. Plaintiffs assert that Dr. Kilburn's testimony and opinions satisfy the legal requirements of Rule 702, Federal Rules of Evidence as defined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) [Doc. 46]. In their brief in support of their motion, plaintiffs point out that the standards enunciated by the United States Supreme Court in *Daubert* are not "a definitive checklist or test" but are merely "some general observations." The Ninth Circuit has interpreted them as "illustrative rather than exhaustive; similarly, we do not deem each of them to be equally applicable (or applicable at all) in every case," plaintiffs observe. *Daubert II*, 43 F.3d at 1317. Instead, plaintiffs suggest, the Rule 702 inquiry is a flexible one and the factors listed by the Supreme Court in *Daubert* may be inapplicable to proffered expert testimony while other, non-enumerated factors may well assist the trial judge in determining the reliability and/or relevance of the proffered

testimony. Dr. Kilburn's opinions and testimony must be evaluated under this flexible standard, plaintiffs assert, and in doing so the court "should not rush to judgment where new scientific theories are proposed that lack adequate support or reputation because they are so new." Plaintiffs quote Thomas S. Kuhn in his treatise, "The Structure of Scientific Revolution" 52 (2d ed.1970):

> New and unsuspected phenomenon are ... repeatedly uncovered by scientific research, and radical new theories have again and again been invented by scientists. History even suggests that the scientific enterprise has developed a uniquely powerful technique for producing surprises of this sort.

*In re: Breast Implant Cases*, 942 F.Supp. 958, 960 (E.D.N.Y.1996).

Plaintiffs initially point out that defendants do not challenge Dr. Kilburn's qualifications, but only his opinions and proposed testimony. In medically evaluating plaintiff, plaintiffs state, Dr. Kilburn performed a Clinical, Neuropsychological Battery, which is a series of tests designed to enable a doctor to reach certain conclusions about a patient. It is based on the Wechsler and Halstead–Reitan tests, and these tests include a Picture Completion and Similarities Test, Verbal Story Recall Test, Visual Design Reproduction Immediate and Delayed Verbal Recall Tests, Digital Span Test, Digital Symbol and Symbol Recall Tests, Fingertip Number Writing Perception Test, Rey 15 Form Test, Culture Fair Test, Vocabulary Test, and other visual and audio measurement tests [Kilburn Depo. at 4–5, Doc. 47, Exhibit B].

Plaintiffs stipulate that Dr. Kilburn has used these tests in determining the effects of chemicals on brain functions. *See* Kaye H. Kilburn, et al., *Pollution–Based Prediction Equations for Neurobehavioral Tests*, Arch.Envir. Health 53:257, 260 (1998); Kaye Kilburn, *Exposure to Reduced Sulfur Gases Impairs Neurobehavioral Function*, So.Med.J. 90:997, 998–99 (1997); and Kaye H. Kilburn, et al., *Balance measured*

*by head (and trunk) tracking and a force platform in chemically (PCB and TCE) exposed and referent subjects,* Occup. & Envir.Med. 51:381, 382 (1994) (sway test and questionnaire for toxicological history) [Doc. 47, Exhibits C–1 to C–3]. These techniques have been developed and refined during fifteen years of testing and research, plaintiffs state, culminating in the publication of Dr. Kilburn's book on the effects of chemicals on the brain. *See* Kaye H. Kilburn, *Chemical Brain Injury* (1998). Plaintiffs have attached a list of neurobehavioral toxicology papers published by Dr. Kilburn to their response, and state that these papers have been subjected to peer review. Thus, plaintiffs state, Dr. Kilburn's opinions that chemical exposure can affect brain function and cause brain damage have been subjected to peer review and are as scientific as any in clinical medicine, using time tested methods of examination, evaluation, and differential diagnosis [Doc. 47, Exhibits D & E].

In addition to these tests, plaintiffs state, Dr. Kilburn reviewed medical records from Dr. Thomas J. Callendar, Dr. Herbert H. Schaumburg, Dr. Fulk, and Dr. William Paulsen. He also reviewed the material safety data sheets ("MSDS") for Rubiflex and Ethacure 100, which contain the same DETA as Rubiflex [Kilburn Depo. at 22; Rule 26(a)(2) Report of David J. Crouse; Doc. 47, Exhibits B & F].

Plaintiffs assert that the materials reviewed by Dr. Kilburn and the tests performed by him in this case are similar to those approved as providing a proper basis for expert testimony in *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2nd Cir. 1995) (reviews of various safety and educational sources, review of MSDS, interviews with the plaintiff, background of the industry, and practical experience). The test results and the review of other medical records caused Dr. Kilburn to reach certain conclusions. The plaintiff's score on the toxic exposure questionnaire is elevated above the average for a non-exposed population, plaintiff has suffered verbal and visual impairment and abnormal scores on the Verbal Story, Visual Design

Delayed, and Vocabulary Score Tests. Moreover, plaintiff has been affected in the areas of intelligence, recall, emotion, vision, and balance, and the abnormality in the color test is more probably than not attributable to his exposure to Rubiflex [Kilburn Depo. at 28, 58, 79, 85, & 124; Doc. 47, Exhibit B].

Plaintiffs further assert that the findings of Dr. Schaumburg, one of defendant's expert witnesses, found plaintiff to suffer from brow ptosis, atypical face pain, and astasia-abastia gait disorder, essentially the same impressions reached by Dr. Kilburn as to his physical findings [Rule 26(a)(2) Report of Dr. Herbert H. Schaumburg, Kilburn Depo. at 101–02; Doc. 47, Exhibits B & G]. Plaintiffs further assert that the toxins in Rubiflex were absorbed through direct skin and eye contact as well as inhalation and although it cannot be determined whether direct contact or inhalation is the more significant exposure factor, Dr. Kilburn noted that organic chemicals such as Rubiflex are generally absorbed through skin layers [Kilburn Depo. at 94, 117–18; Doc. 47, Exhibit B].

Plaintiffs further assert that Dr. Kilburn has personally examined twenty-two to twenty-three patients with single acute chemical exposure which resulted in brain damage and each had a progressive loss of function similar to that experienced by plaintiff. Of these patients, six had exposure to epoxy-based chemicals and, plaintiffs assert, Rubiflex is an epoxy. The chemical components of Rubiflex would adversely affect the brain either as a solvent or as an epoxy, plaintiffs contend [Kilburn Depo. at 99, 121, 127 & 138; Doc. 47, Exhibit B].

Plaintiffs further assert that Rubiflex contains two components known to be toxic. Rubiflex is an epoxy containing DETA which is very toxic, plaintiffs assert, and based on the amount of DETA in Rubiflex, that product should be classified as "very toxic." As a known toxin, plaintiffs contend, DETA plays a major role in the

toxicity of Rubiflex and Rubiflex also contains formic acid, another known toxin. Because Rubiflex contains two well known toxins, Dr. Kilburn concluded that Rubiflex is toxic to the human body [Kilburn Depo. at 99, 124–26, & 158, Doc. 47, Exhibits B, F & H]. Plaintiffs assert further that Dr. Kilburn conducted differential diagnosis to determine if other causes contributed to the plaintiff's maladies, but concluded that none played a factor. He found no evidence of other chemical exposures and no history of pre-existing or spontaneous neurological disease, and his extensive testing indicated no alternate factors. It is not believed that allergies played a role, plaintiffs state, and the likelihood that plaintiff would have a spontaneous neurological incident that coincides in time with, yet is independent of, the chemical incident is essentially nonexistent. This suggests that the plaintiff's symptoms are either real or invented, plaintiffs state, and even Dr. Schaumburg reached the same medical findings as Dr. Kilburn. Plaintiffs assert further that defendants do not seriously contend that plaintiff is not damaged in some manner. Rather, defendants primary area of challenge is causation and Dr. Kilburn extensively searched for other causes, but the plaintiff's history revealed none. Thus, plaintiffs conclude, his exclusion of other causes mitigates in favor of admission of his testimony. *See Hein v. Merck & Co., Inc.,* 868 F.Supp. at 231.

Finally, plaintiffs assert, Dr. Kilburn was unable to state whether goggles, gloves, or other protective gear would have made a difference [Kilburn Depo. at 184; Doc. 47, Exhibit B]. The material safety data sheet on Rubiflex advises of the potential eye and skin irritation from exposure and/or contact with Rubiflex and further advises that users of Rubiflex wear "impervious gloves and apron," chemical goggles, and, if necessary, a full face shield [Doc. 47, Exhibit H]. Plaintiffs further assert that other documents used by defendant ICI Americas, Inc., regarding Rubiflex specifically advise that the chemical may cause cancer and further advise that handlers wear the same safety equipment

recommended by the MSDS [Doc. 47, Exhibit I].

Plaintiffs acknowledge the criticism leveled at Dr. Kilburn's methodology by the report of Dr. Phillip S. Guzelian who has not examined the plaintiff, has not reviewed any materials to enable him to offer a causation explanation, and is unable to provide one. His report is apparently offered solely to attack Dr. Kilburn's opinions, plaintiffs assert, and state his role in this litigation as follows:

> I have been asked to evaluate the plaintiff's claim of injuries in the context of feasible exposure levels of the chemicals in the materials at the airport facility. To do that, I have considered whether the evidence and opinions adduced by Dr. Kilburn, testifying on behalf of the plaintiff adhere strictly to the scientific method for establishing that a cause and effect relationship exists between a chemical exposure and the presence of a medical condition in a specific plaintiff, and thus, satisfy the guidelines of the recent Supreme Court's *Daubert* decision for determining the admissibility of expert evidence. In my opinion, they do not.

[Doc. 45, Exhibit C]. Thus, plaintiffs contend, Dr. Guzelian has been retained to reach a legal conclusion, which suggests an opinion reached solely for the purpose of litigation. His legal qualifications for reaching this conclusion are not mentioned, and this is a conclusion for the district court to reach. In any event, plaintiffs state, Dr. Guzelian's criticism is more properly directed toward the weight to be given to Dr. Kilburn's opinions, not their admissibility. "Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree." *Holbrook v. Lykes Brothers Steamship Co., Inc.,* 80 F.3d 777, 783 (3rd Cir.1996).

The basic question in a *Daubert* analysis is whether the expert's proffered testimony is the result of good scientific procedure, plaintiffs assert, and Dr. Kilburn clearly satisfies that standard. Dr. Kil-

burn conducted extensive and widely used tests on the plaintiff to determine his medical condition, he examined plaintiff's medical history to determine whether causes other than the Rubiflex exposure could have contributed to these symptoms, and he examined the contents of Rubiflex and discovered that it contains at least two toxins known to affect the brain and to cause other neurological damage. Plaintiff is not unique in being a single exposure case, plaintiffs state, as Dr. Kilburn has personally examined twenty-three similarly situated patients. Further, single exposure cases are a recognized problem and Dr. Kilburn has compared his findings with the plaintiff to those of control groups in other studies, and the findings there support his conclusions. Thus, plaintiffs state, Dr. Kilburn's opinions are not frantic speculation by a chemically adverse person, but instead are the most plausible explanation based on the results of testing, studies, differential diagnosis, and careful comparison. Simply stated, plaintiffs state, the issues in this case are whether the plaintiff was damaged and, if so, whether the damage is attributable to his exposure to the defendants' chemicals. There seems to be little doubt as to the damage itself, as both Dr. Kilburn and Dr. Schaumburg reached the same medical condition findings using methods used for decades by neurologists and other medical specialists for determining impairment. The difference of opinion is causation, plaintiffs state, and Dr. Kilburn went further to attempt to exclude other causes and successfully did so. Thus, his opinions that the plaintiff's condition is caused by his exposure to known toxins and the defendants' chemicals is based, plaintiffs assert, on sound science and passes *Daubert's* criteria for admissibility.

In conclusion, plaintiffs state that the Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact. Rule 702, which governs the admissibility of expert testimony, specifically embraces this policy and has a liberal policy of admissibility.

*Holbrook v. Lykes Brothers Steamship Co., Inc.,* 80 F.3d at 780 (citations and internal quotes omitted). To be admissible, Rule 702 requires only that the proffered expert testimony assist the jury, not that it prove a certainty, and Dr. Kilburn's opinions satisfy this requirement. The weight to be given his testimony, however, is for the jury [Doc. 47].

### C. Defendants' Reply

Defendants have filed a reply memorandum supporting their motion in limine, arguing, first of all, that plaintiff has misrepresented Dr. Schaumburg's opinions. Dr. Herbert H. Schaumburg, ICI's expert on neurotoxicology, did not agree with the findings made by Dr. Kilburn. According to Dr. William Paulsen, "Dr. Schaumburg is considered to be the best known expert on neurotoxicology in the United States. He enjoys a superb and probably worldwide reputation." [Paulsen Depo. at 25, Doc. 49, Exhibit A]. Dr. Schaumburg has not only authored numerous peer-reviewed articles on neurology and neurotoxicology, he is the co-editor of the first comprehensive textbook on neurotoxicology, and has also authored a textbook on disorders of the peripheral nerve. Far from agreeing with Dr. Kilburn, defendants assert, Dr. Schaumburg clearly stated in his Rule 26 report:

1. Based upon my neurological examination of Andrew Downs, I can find no evidence of a neurological impairment that may be attributable to the reported chemical exposure of 1995.

2. Given the nature of Mr. Downs' complaints, my neurological examination of him and the findings of Dr. Steven Herskovitz, Thomas Slomowitz, William Paulsen, and David Masur, the most probable explanation for his complaints is his desire for secondary gain from the lawsuit he initiated.

Not only does Dr. Schaumburg disagree with Dr. Kilburn's opinions about plaintiff and his alleged injuries, defendants state, Dr. Schaumburg expressed specific criti-

cisms of Dr. Kilburn's qualifications, medical conclusions, and testing of the plaintiff. For example, defendants point out, based upon Dr. Kilburn's deposition testimony concerning his training and experience, Dr. Schaumburg concludes that Dr. Kilburn is not qualified to give neurological diagnosis about the plaintiff and that several of Dr. Kilburn's opinions are not generally accepted in the field of toxicology and are contrary to fundamental principles of neurology, neurotoxicology and toxicology [Doc. 49, Exhibit B].

Defendants further assert that plaintiff has not met his burden under *Daubert* for the reasons previously enumerated by defendants, and further point out that Dr. Kilburn's testimony was recently excluded in yet another toxic tort case. In that decision, *Bautista v. Christian Salvensen, Inc.,* No. 761489 (Sup.Ct.Calif., September 23, 1998), the court excluded Dr. Kilburn's testimony, holding:

I cannot accept and do not accept, based under the cases, that without a reasonable investigation of prior medical history and other causal explanations, that anybody could testify that exposure to anhydrous ammonia was a reasonably medical, probable cause of the symptoms that were suffered.

So, to me, it is like making an opinion with less than half a deck. I really am concerned that we even attempt to offer this kind of "psuedo-scientific clap-trap."

*Bautista,* at 9–10 [Doc. 49, Exhibit C].

Defendants further assert that the decision of the Second Circuit Court of Appeals in *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038 (2nd Cir.1995) is inapplicable to the case at bar. Performing a valid differential diagnosis by necessity requires the same type of analysis performed by toxicologists, defendants argue, and the threshold objective is to identify all of the known possible causes of the specific condition in question. The causes must be ruled in before they are ruled out, and ruling in a toxicological cause requires credible scientific evidence that a particular chemical can cause the condition. To establish this, someone in the scientific community has to perform valid tests using the generally accepted methodology described in Dr. Guzelian's affidavit, because without credible scientific evidence that a condition can be caused by a particular chemical, attributing the condition to exposure to the chemical solely on the basis that the exposure preceded the condition is not science, but speculation. Defendants assert further that Dr. Kilburn's methodology for arriving at his differential diagnosis is invalid because Dr. Kilburn is not plaintiff's treating physician, did not review his medical records or conduct a meaningful investigation into plaintiff's physical condition prior to exposure to Rubiflex, did not perform or review any pathological studies, did not review all of the pertinent MSDSs before forming his opinion, and did not cite to any scientific or medical treatises to support his opinion that a single, brief exposure to Rubiflex or its components can cause permanent, progressive damage to the central nervous system. In fact, defendants assert, there is no evidence that Dr. Kilburn even conducted a search of the scientific and medical literature until after forming his opinion. As stated by the Ninth Circuit Court of Appeals in *Claar v. Burlington Northern R. Co.,* 29 F.3d 499, 503 (9th Cir.1994), "Coming to a firm conclusion first and then doing research to support it is the antithesis of this [the scientific] method."

Defendants further assert that Dr. Kilburn's opinion is unreliable because it is based upon unreliable information about plaintiff, pointing out that Dr. Kilburn relies entirely upon plaintiff for information about his medical history, the facts and circumstances surrounding his exposure, and the development of his alleged symptoms. Thus, defendants assert, Dr. Kilburn's differential diagnosis is only as reliable as the information plaintiff provided to him. A differential diagnosis based upon inaccuracies and misplaced assumptions is not good medicine or good science. Defendants point out that Dr. Kilburn's toxic exposure questionnaire included a

question about prior trauma to the head which plaintiff did not answer. Had Dr. Kilburn reviewed plaintiff's medical records, defendants state, he would have discovered that plaintiff sustained concussions on two occasions prior to the exposure. Plaintiff admitted in his deposition that he sustained a concussion while playing high school football in September 1986, and although plaintiff denied sustaining any other head injuries, his medical records reveal that he sustained another concussion in a motor vehicle accident in December 1987 [Downs Depo. at 225, Doc. 49, Exhibit D].

In conclusion, defendants state that Dr. Kilburn is not a psychologist, neurologist, or toxicologist and he has little or no formal training in those fields. He has created a cottage industry out of giving neurotoxicological examinations, however, primarily to plaintiffs in toxic tort cases. Dr. Kilburn's self-proclaimed revolutionary beliefs about the adverse effects chemicals allegedly have on the brain and central nervous system are not generally accepted and are not supported by any credible scientific evidence, defendants argue, and this is precisely the type of junk science *Daubert* was designed to eliminate from the courtrooms of this country. Accordingly, defendants conclude, Dr. Kilburn should not be permitted to give testimony in this case [Doc. 49].

### III.

*PLAINTIFFS' EXPERT WITNESS*

Defendant has moved to exclude the testimony of plaintiff's expert, Dr. Kaye H. Kilburn, asserting that Dr. Kilburn's opinions do not satisfy the legal requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and he is not qualified to testify about ICI's product.[3] The qualifications, experience, and opinions of Dr. Kilburn are set forth below.

Dr. Kaye H. Kilburn is a medical doctor who graduated from the Utah College of Medicine and initially interned in surgery and completed a medical residency in internal medicine at Duke University in 1957/1958. He served two years in the U.S. Army Medical Corps. running a laboratory for cardio-pulmonary physiology at Fitzsimmons General Hospital, spent a year in cardiology in London, and became board eligible in cardiology. He served on the medical faculty at the University of Colorado, then at Washington University in St. Louis, and then served as an associate professor of medicine at Duke University and chief of medical services at the Veterans Administration Center at Durham. He organized the first department of environmental medicine at Duke University.

Dr. Kilburn participated with the National Institute of Occupational Safety and Health in solving the problem of airborne toxicity leading to the lung disease Byssinosis, which is a similar disease to chronic bronchitis, but is induced by the widespread distribution of cotton dust in textile mills. Dr. Kilburn founded a new division of pulmonary environmental and critical care medicine at the University of Missouri and then went to Mt. Sinai Medical School in New York to head the research department of the Center for Environmental Medicine and worked in the laboratory that studied PCB toxicity identification, asbestos toxicity, and studies on the neurobehavioral effects of chemicals.

In 1980, Dr. Kilburn became the Ralph Edington Professor at the University of Southern California. Dr. Kilburn has published approximately 236 professional papers dealing with toxicity of various materials, the last 36 or 38 of which dealt with nervous system responses to chemical agents. Dr. Kilburn has also written a book entitled, *Chemical Brain Injury*, which was published by John Wiley &

---

**3.** Plaintiffs have identified only Dr. Kilburn as offering opinions on medical causation, and plaintiffs have stipulated that they will offer no other expert testimony on the issue of medical causation in this case [Doc. 51].

Sons in New York, New York. Dr. Kilburn also has under consideration at University of Indiana Press a book entitled, *Foul and Mischievous Air,* and a third book entitled, *Twentieth Century Plagues,* that is under consideration by a publisher in New York. All of Dr. Kilburn's books deal with his research and experience in the field of chemicals and their effect upon the human body. Dr. Kilburn currently serves as editor in chief of one scientific journal and serves on the editorial boards of three others. Dr. Kilburn is board certified in Internal Medicine and in Preventive Medicine and Occupational Health. Dr. Kilburn's latest book was reviewed by Dr. Alan Hirsch, who is board certified in neurology and psychiatry.[4]

Dr. Kilburn testified at the *Daubert* hearing held in this case that he has developed a method of testing and examining individuals who have been exposed to various chemicals. He related that he conducts what has traditionally been called neuropsychological testing which aims at testing mental functions like problem solving, memory, both recall memory, immediate recall and delayed recall, and that he uses standard methods that were developed by Dr. David Wechsler. He also uses other tests from the Halstead Battery developed at the University of Chicago by a psychologist working with neurologists and neurosurgeons. Dr. Kilburn adopted from the Wechsler and the Halstead Batteries the tests that are designed to discriminate between people exposed to chemicals and the general population.

Dr. Kilburn related that the tests that he described in his book were similar to tests that he used in treating and diagnosing the plaintiff in this case, Andrew A. Downs. Dr. Kilburn related that the methods he uses differ from traditional tests or modalities in the neurological field mostly by extending the tests to get numbers instead of impressions. Dr. Kilburn related that he has objectified the tests and made the calculus one of comparing

numbers and has further increased the sensitivity of many of the tests from other disciplines, for example, ophthalmology.

Dr. Kilburn testified that, based upon his studies and the use of tests developed by other individuals, his method and his studies were considerably more accurate than those traditionally used and pointed out that his writings concerning his testing and tests had been reviewed independently and adopted by others.

Dr. Kilburn further testified that he examined the plaintiff, Andrew A. Downs, in February 1996. Mr. Downs presented himself to Dr. Kilburn seeking to determine if his impairments were real or imagined and Dr. Kilburn found Mr. Downs to be a 25-year old young man with some fairly advanced kinds of impairments that do not ordinarily occur in 25-year olds. Dr. Kilburn tested Mr. Downs for balance using the quantitative Romberg test and compared his findings to tests administered to normal people and found that plaintiff was outside of the range for normal individuals. Dr. Kilburn further tested plaintiff's reaction time and found that he had an abnormal choice reaction time. The tests administered by Dr. Kilburn demonstrated that plaintiff's processing is slowed, that is, his judgmental processing of information. That processing takes place in the brain, probably between the parietal and frontal lobes of the brain.

The tests administered by Dr. Kilburn are all intended to sample the central nervous system. Dr. Kilburn also administered a blink reflex test to see how fast the eye gets ready to close. Dr. Schaumburg found that plaintiff had a blink rate of 12.6 for his right eye and 13.6 for his left eye, both of which were within normal limits. Dr. Kilburn further tested plaintiff's hearing by audiometry and found that his hearing was very slightly decreased, within normal limits, in both ears. He then administered a color vision test, called Color Confusion Index, and found plaintiff had

4. The review of Dr. Kilburn's book, *Chemical Brain Injury,* by Dr. Alan R. Hirsch was offered into evidence as plaintiff's Exhibit "1" at the *Daubert* hearing.

only slight abnormalities, nothing that would put him across one and a half deviations from expected. Dr. Kilburn further conducted testing of plaintiff's visual fields and found that plaintiff had major defects on both eyes. The tests revealed reduction in the upper fields of both eyes and an enlarged blind spot on the right eye. Dr. Kilburn completed the vision test by doing contrast sensitivity, which appraises overall vision rather than looking for defects in the vision fields.

The next test administered by Dr. Kilburn was to measure grip strength' and found that his grip strength for both right and left arms was normal.

Dr. Kilburn then administered a series of psychological tests, seeking to test the plaintiff's long-term memory, which he found to be good. He also tested plaintiff's recall of stories, and found that plaintiff had very poor recall memory. Dr. Kilburn testified that plaintiff's old memory is fine, but in attempting to keep track of new information, plaintiff loses about 80% of it. The norm is 55% retention, and 45% loss, so plaintiff's loss is much greater than normal.

Dr. Kilburn also administered other memory tests for visual design, and plaintiff's immediate response was about 75%, but he lost half of that in 30 minutes. Plaintiff does better with things he sees than he does with things he hears, but with things he sees he has a high loss within 30 minutes, which is unacceptable and a serious loss. Dr. Kilburn also administered a digit span forward and backward, and on that test plaintiff did fine, and also did well on flash memory. But if you extend the flash memory to two or three minutes, plaintiff has a serious impairment shown by the loss of verbal memory. Dr. Kilburn then administered three tests for competency to do visual and manipulative tasks and did another test for cognitive function, on which he did superbly. Another test Dr. Kilburn administered is a malingering check, on which plaintiff received a perfect score, indicating that there was no evidence of malingering.

Dr. Kilburn further administered a questionnaire called a Profile of Mood States and found that plaintiff's degree of upset was very elevated on February 13, 1996.

Dr. Kilburn further testified that the tests he administered are verifiable and reproducible and have been subjected to peer-review. The tests he administered are widely accepted and used in the relevant scientific community, the tests do not rely on subjective analysis, and incorporate a very conservative expression for abnormality.

Dr. Kilburn testified further that an important piece of information he obtained from the plaintiff was whether he had any pre-existing impairments and his medical history. From his performance on the tests administered that are resistant to chemicals, the absence of contributing factors, Dr. Kilburn related that there was nothing that could explain plaintiff's impairment except whatever he was exposed to. Dr. Kilburn related that he obtained information from plaintiff's wife as to his condition prior to his exposure, and found that plaintiff had left school in the eleventh grade to go to work. He determined that plaintiff had a masterful level of intelligence prior to his exposure and found no evidence that he had any kind of impairment of his facial movement or of his face prior to his exposure, and he noted in plaintiff's medical history that Dr. Lim did imaging of plaintiff's brain and skull, magnetic resonance of his brain and neck pattern, showing no abnormality and that the spinal fluid was normal. There was no evidence then or now of any pre-existing or spontaneous neurological disease that could have gotten worse coincident with the exposure, Dr. Kilburn related, and he concluded that exposure to chemicals was the cause of his impairment. He obtained a history of plaintiff's exposure to the chemical and found that plaintiff had been splashed by the chemical on the right side of his body and face.

This medical history was consistent with Dr. Kilburn's findings, he testified, but he was not acquainted with the particular chemicals within the chemical mix to which plaintiff was exposed. He got information about them later, which Dr. Kilburn stated that he found cleaner and clearer in order that he would not build preconceived notions before he tests a patient which might influence his findings adversely or unpositively. He then looked for the association that would be plausible and logical and ruled out those that were less logical and less plausible, coming down to a single exposure, brief as it was, which was direct by contact and inhalation and made a reasonable conclusion of cause and effect. Dr. Kilburn concluded that the exposure to the chemical caused the result that he observed, and related that his conclusion was within a reasonable degree of medical and scientific certainty.

At a later time, Dr. Kilburn did get more information on the substance plaintiff was exposed to which supported his conclusions. Dr. Kilburn related that chemicals such as epoxy or polyurethane are extremely toxic, like the diisocyanates as a group and some of the accelerators and polymer systems, like Rubiflex, DETA, for example, the diethyltoluene diamine. Dr. Kilburn testified, however, that through his expert knowledge, testing, the modalities he used, the histories he obtained, he had not been able to draw a conclusion within a reasonable degree of medical scientific certainty as to what in the Rubiflex may have caused the injury received by plaintiff. On the other hand, he was able to draw a conclusion within a reasonable degree of medical scientific certainty that the Rubiflex or something contained therein caused plaintiff's injuries. "I think it has to be that the Rubiflex in that container, whatever its alternations may have been, did the toxic injury, but I am unable from information available to me or that I have been able to try to assemble from other sources, even put these things in anything more than a, you know, an array

of possibilities that I have explained that would multiply."

Dr. Kilburn testified that, from his experience, injuries such as that afflicting the plaintiff, tended to be permanent, and he could say that with a 90% certainty. He had seen some individuals who had some degree of recovery, but a full recovery he had never seen. In addition, there is no therapy to improve plaintiff's injuries. Dr. Kilburn advised plaintiff to avoid further exposure to chemicals because he had demonstrated a degree of sensitivity that may be ordinary or may be different from ordinary.

On cross-examination by counsel for defendant ICI Americas, Inc., Dr. Kilburn admitted that Dr. Alan R. Hirsch, who wrote the review of his book, *Chemical Brain Injury*,[5] was offered as an expert along with Dr. Kilburn in the case of *Nelson v. Tennessee Gas Pipeline Company*, No. 95–1112, 1998 WL 1297690 (W.D.Tenn. Aug.31, 1998). Dr. Kilburn further admitted that he and Dr. Hirsch prepared expert opinions regarding the plaintiff's exposure to PCBs causing neurological problems and both were excluded in a *Daubert* hearing from providing expert testimony in that case. Dr. Kilburn saw plaintiff on one occasion, on February 13, 1996, and wrote a letter to plaintiff on February 16, 1996. Dr. Kilburn stated that his diagnosis that he made of plaintiff at that time continues to be his diagnosis as of the time of the *Daubert* hearing, and his conclusion was that plaintiff's condition was caused by his exposure to Rubiflex. That same opinion is incorporated into his report dated July 28, 1998, and it is the same opinion that he gave in his deposition of September 1–2, 1998.

At the time of his diagnosis of plaintiff, Dr. Kilburn had seen no medical records on plaintiff, and he had not seen any of plaintiff's employment records to determine what sort of jobs he had performed and what exposure he might possibly have

incurred in his employment. Dr. Kilburn stated that he covered this information in preparing his medical history, but that he received all of his information from plaintiff and his wife. Dr. Kilburn was aware that plaintiff had been exposed to aircraft fuel solvents in the course of his work, but he had not reviewed the MSDSs for Rubiflex or its constituents at the time he rendered his expert opinion on February 16, 1996. He was not aware of the amount of Rubiflex plaintiff had been exposed to, he had not performed any animal studies with Rubiflex, and did not know if any such studies had been performed with the exact components or Rubiflex. He was not aware of the dosage of Rubiflex received by plaintiff and had not done any testing or modeling to calculate plaintiff's exposure to Rubiflex. Dr. Kilburn agreed with the statement made in his deposition that he had found no scientific or medical literature suggesting that Rubiflex could lead to neurological problems, but stated that the injury received by plaintiff demonstrated that Rubiflex exposure resulted in plaintiff's injury.

Dr. Kilburn admitted that although he had mentioned diisocyanates in his testimony and in his report of July 28, 1998, he did not know if diisocyanates was a component of Rubiflex. Dr. Kilburn further admitted that the article he referred to in his July 28, 1998, report relating to diisocyanates discussed respiratory problems caused by the chemical but that the pulmonary function test administered by Dr. Kilburn on plaintiff was normal.

Dr. Kilburn testified that the strength of the association between Rubiflex and plaintiff's neurological problems was 100%, taking into account plaintiff's situation, but he was not aware of any other exposures to Rubiflex. In response to counsel's question, "So how much of an exposure to Rubiflex is necessary to produce neurological problems," Dr. Kilburn replied, "Oh, is that really a pertinent question? We know that for Andrew Downs he received enough, and as my pharmacology professor, Lewis Goodman, replied when asked what was the proper dose of a drug, he would say enough to do the job you're looking to get done. And, you know, if the job was to cripple Andrew Downs, then he got the dose that would do that." Dr. Kilburn stated that while it was possible that the splash of Rubiflex which got into his eye affected his visual field, it was unlikely that the Rubiflex penetrated the eye because the eye's retina is well defended against outside influences. At the same time, Dr. Kilburn testified, things do get into the blood stream and go to the eye and can wipe the retina out. Dr. Kilburn admitted that the splash that plaintiff received in his right eye was not what caused the damage to his visual field.

After plaintiff was exposed to Rubiflex, there was a period of time when plaintiff seemed to be incubating without having any neurological symptoms but he was not aware of any literature speaking to neurological problems resulting from a single exposure to the chemicals which are in Rubiflex. There is literature discussing neurological problems resulting from sniffing glue over quite a long period of time, which contains toluene. Dr. Kilburn also stated that as far as other potential causes for plaintiff's neurological problems that he had found, all of the information that Dr. Kilburn had about plaintiff's prior exposures came exclusively from either plaintiff or his wife. In addition, Dr. Kilburn admitted that he did not know of any precedents for neurological symptoms like he observed in plaintiff from one occasion of glue sniffing.

## IV.

### DEFENDANTS' EXPERT WITNESSES

Defendant ICI Americas, Inc., presented the testimony of Dr. David M. Masur. Dr. Masur related that he is a neuropsychologist, holding a Ph.D. in neuropsychology from the City University of New York. He is board certified as a clinical neuropsychologist by the American Board of Professional Psychology and he is currently the Director of Neuropsychology in the Department of Neurology at Montef-

ior Medical Center and a clinical professor of neurology at Albert Einstein Medical School. Dr. Masur's curriculum vitae was introduced into evidence as Defendant's Exhibit 2. Dr. Masur explained that neuropsychology is a speciality of psychology that involves trying to understand how the brain works. Typically, Dr. Masur testified, neuropsychologists used standardized psychological tests to determine how people function, and the kinds of cognitive behaviors that people use on a day to day basis. The word, "cognition," simply describes things like memory, language, concentration, and special abilities, and specific tests are administered in order to investigate each of those particular areas and to try to infer something about brain function.

Dr. Masur testified that he examined and evaluated plaintiff and disagreed with the findings of Dr. Kilburn. Dr. Masur testified that he had reviewed Dr. Kilburn's methodology with respect to neuropsychology and related that the methodology employed by Dr. Kilburn in his neuropsychological evaluation of plaintiff was not consistent with what is generally accepted in the neuropsychological community. Dr. Masur related that neuropsychological testing by its very nature is fairly involved and requires administering many different kinds of tests. One of the hallmarks of a finding in neuropsychology is the repeatability of certain tests in order that the tests can be standardized and roughly measure the same function when administered. In his review of the test battery that Dr. Kilburn used, Dr. Masur related, he found that Dr. Kilburn extracts different subtests from tests that are standardized and administers them inconsistently. For example, Dr. Kilburn uses a test like trail making, which is one test of visual motor function, and Dr. Kilburn will administer a particular kind of memory test. There is no basis or consistency for developing a battery to investigate the particular functions, Dr. Masur testified. In addition, the administration of the test is done by an individual who has no training in psychology. It is the standard of practice of the International Neuropsychological Society that trained graduate or doctoral students in psychology must administer these tests because they require specific detailed training in order to give and interpret a number of the tests. All I.Q. tests are protected, Dr. Masur testified, and only a licensed psychologist should be allowed to administer an I.Q. test unless it is being administered for research purposes.

Dr. Masur pointed out that Dr. Kilburn related that plaintiff had one abnormal score on one memory test, but the test is statistically elevated, which is language that is inconsistent with any kind of demonstration of significance, because there is no basis for understanding what a statistical elevation is. Dr. Masur stated that, after listening to Dr. Kilburn, the norms that he used are based on his own collective data as opposed to looking at standardized test data which has been standardized on a large number of individuals. Dr. Masur further pointed out that Dr. Kilburn concluded that plaintiff is not malingering and based his opinion upon the information subtests of the Wechsler Adult Intelligence Scale, and related that particular test had never been demonstrated to have anything to do with the measurement of malingering. In addition, Dr. Kilburn relied upon the Rey 15–Item Recall Test which he characterized as a test of malingering and plaintiff performed perfectly on that test. The problem with that test is, however, Dr. Masur testified, it is well known in the neuropsychology literature to be insensitive to malingering and is an older version of tests that are much more statistically validated and reliable. Dr. Masur further pointed out that Dr. Kilburn relied upon reaction time tests which require the giving of maximum effort by the individual taking the test. Last of all, Dr. Masur points out that Dr. Kilburn relies upon test norms but never specifies what the control group is upon which he bases those norms.

Dr. Masur testified that there is a generally accepted methodology for evaluating someone who is believed to have had a brain injury from exposure to toxic chemicals and stated that a clinical neuropsychological evaluation is no different from any other attempt to investigate any other kind of brain dysfunction. A neuropsychologist will take a medical history, and administer a fairly long battery of tests, keying in on the reproducibility of the results. A neuropsychologist would administer two or three different kinds of memory tests or two or three different kinds of tests of concentration, a test to measure malingering or symptom validity, and a test of emotional and personality functioning. This standard protocol or methodology is set forth by the two major organizations dealing with neuropsychology, the International Neuropsychological Society and the National Academy of Neuropsychology. The testing done on the plaintiff did not follow this protocol. The neuropsychological or neurobehavioral testing that plaintiff received is a collection of some different subtests from the Wechsler Scale and a couple of other subtests, tests of memory and tests of symptom validity or malingering, which are generally not employed today, Dr. Masur testified. The protocol identified by Dr. Masur is generally accepted in the field of neuropsychology and while all neuropsychologists will not use the identical test battery, the general principles of clinical evaluation hold forth among neuropsychologists, which is the reproducibility of the results, the attempt to investigate as many areas of dysfunction or possible dysfunction as one can, to investigate symptom validity and to investigate personality function. There are generally accepted practices in the field of neuropsychology, Dr. Masur testified, and Dr. Kilburn's methodology does not fit in the generally accepted methodology in the field of neuropsychology.

On cross-examination, Dr. Masur testified that, in regard to the Rey Recall Test, the deviation from normal is 2.0 rather than 1.5 and Dr. Masur found that plaintiff performed more poorly on that exam than he did when the test was administered by Dr. Kilburn.

The next witness presented by the defendant was Dr. Herbert H. Schaumburg, M.D. Dr. Schaumburg's curriculum vitae was introduced into evidence as Defendant's Exhibit 3. Dr. Schaumburg is Professor and Chairman of Neurology at the Albert Einstein College of Medicine and his sub-speciality is neurotoxicology, which is the study of the adverse effect of chemicals upon the nervous system. Dr. Schaumburg received his medical degree in 1960, served his internship at Vanderbilt University Hospital, did a neurology residency at Albert Einstein College of Medicine and two years of fellowship at the Massachusetts General Hospital, and a year of fellowship at the University of London. Dr. Schaumburg has been at Albert Einstein College of Medicine since completing his training and has studied the adverse effects of chemicals on the brains and nervous systems of animals and of human beings.

Dr. Schaumburg explained that the field of neurotoxicology involves the undesired effect of chemicals, either pharmaceutical chemicals, drugs used to treat people or drugs of abuse, and also industrial chemicals and environmental chemicals. Dr. Schaumburg has written about 105 papers in this field and edited the standard textbook used for the teaching of neurotoxicology. Dr. Schaumburg examined and evaluated plaintiff, along with his colleague, Dr. Herskovitz, and his findings are set forth in his Rule 26 report as follows:

1. Based upon my neurological examination of Andrew Downs, I can find no evidence of a neurological impairment that may be attributable to the reported chemical exposure of 1995.

2. Given the nature of Mr. Downs' complaints, my neurological examination of him, and the findings of Drs. Steven Herskovitz, Thomas Slomowitz, William Paulsen, and David Masur, the most probable ex-

planation for his complaints is his desire for secondary gain from the lawsuit he initiated. [Doc. 49, Exhibit B, attached].

Dr. Schaumburg related that he had reviewed Dr. Kilburn's methodology used in diagnosing plaintiff and in reaching his expert opinions, and Dr. Schaumburg disagrees with Dr. Kilburn's methodology. In addition, Dr. Schaumburg testified that four of Dr. Kilburn's conclusions are in striking disagreement with the seven fundamental tenants of neurotoxicology. The first is the delay in the onset of two and one-half months following one exposure to the injury complained of by the plaintiff. Based upon his experience in hundreds of cases of people exposed to solvents and things of that nature, the individual knows about it very quickly when an individual is exposed to a toxic chemical, and waiting two and one-half months to have the onset of ptosis and facial numbness would be unheard of. Second, Dr. Schaumburg testified, for substances of this type it takes repeated exposure to these sorts of chemicals to produce any kind of persistent effect. One exposure to a high level of a solvent or a polymerizing substance can produce intoxication, can make the individual very light-headed, and can even make the individual lose consciousness, but it is very much like having an anesthetic, you get up the next day and you are fine, Dr. Schaumburg explained. For example, sniffing toluene will cause the individual to have a terrible headache and to be unsteady the next day, but in two days, the individual would be fine. It takes repeated exposure of about six months of inhaling toluene or other solvents to damage the brain and the nervous system.

Third, neurotoxins of this type do not affect only one side of the face and only one eye. If you are exposed to a neurotoxic substance like acrylamide, it isn't the hand that gets the neuropathy, it's the whole body, the feet and both hands, because the chemical gets into the nervous system and circulates throughout the brain and the nerves. It is not a local effect, Dr. Schaumburg testified. Fourth, Dr. Schaumburg testified, after plaintiff had his eyelid problem and facial numbness and was seen by an experienced neurologist and was found to have no neurological findings, he continued on to have a progressive deficit. Plaintiff asserts that he has cognitive impairment and now has a very unsteady gait. This does not happen, Dr. Schaumburg testified, because if you get exposed to a neurotoxin you will certainly have a deficit, but then you get better, in almost every instance, you get better. You do not go on to get worse, because the chemical is not stored in the body but eliminated from the body.

Dr. Schaumburg stated that these four fundamental tenets apply to this case and sum up his feelings about the case. There is a very close temporal association between the symptoms of the victim and the exposure, and a delay of two and a half months between the same is not recognized in the medical literature. A one-time exposure does not produce the type of results experienced by plaintiff for a chemical such as Rubiflex. Rather, it requires daily exposure. The difference between generalized problems and local problems is also a significant consideration, Dr. Schaumburg testified. Plaintiff's complaints were primarily on one side, and a neurotoxic disease is never local and never strikingly asymmetrical. The chemicals go all over the nervous system, and when they get to the brain they do not go to just one half of the brain, but to the whole brain. Last of all, the difference between the immediate deficit versus a progressive deficit is also important and recognized in the medical literature.

Dr. Kilburn, in his deposition, testified that plaintiff's droopy eye and his ptosis was evidence of the seventh nerve palsy and seventh nerve involvement. Dr. Schaumburg said that this finding is erroneous. If the seventh nerve is involved, the individual's eye is too wide open. In addition, neurotoxic chemicals do not cause seventh nerve lesions of one side, it would be bilateral.

On cross-examination, Dr. Schaumburg testified that there are two chemicals that give rise to facial paralysis without other findings. One is ethylene glycol poisoning and the other is severe cases of trichloroethylene intoxication. But in those instances, the facial involvement is symmetrical, never just on one side. In plaintiff's case, his involvement is one-sided, he did not have any complaints of numbness on the other side of his face, and his other eyelid did not lag. Dr. Schaumburg further testified that people react to toxic chemical exposure in a remarkably stereotypical manner with very few exceptions. The problem with individuals, Dr. Schaumburg stated, is that one individual can be standing right next to another and get a very different exposure.

Dr. Schaumburg pointed out that plaintiff was examined by a very well qualified senior neurologist, Dr. Paulsen, who found no neurological problem with the plaintiff except for his drooping lid and a complaint of headache. That is the reason why, Dr. Schaumburg testified, he felt very confident that plaintiff did not have a subtle problem that would not manifest itself until two and a half months after his exposure. The headache should have gone away after a period of time unless plaintiff had a history of migraine. Plaintiff was also examined on several occasions by a dermatologist, Dr. Faulk, for local irritation, but when Dr. Paulsen examined plaintiff two and a half months later, he was "neurologically clean, without complaints." Secondly, Dr. Schaumburg stated, plaintiff's eye problem really was an urticarial, it was an allergic problem, that Dr. Faulk picked up, and it probably is not related at all to Rubiflex. Dr. Schaumburg testified further that if an individual is a migraineur, exposure to a toxic chemical could trigger an episode of migraine, but that will stop. "You don't wind up with lifelong headaches with one exposure to a neurotoxic chemical. Every day people are exposed to carbon monoxide which causes a terrible headache, and they don't feel well for several days, but then they are not left with lifelong headaches from that."

Dr. Schaumburg related that plaintiff was sent to Dr. Paulsen because people were concerned about the drooping eye that he had been seen for and the mistaken impression that he had a seventh nerve lesion. By the time he saw Dr. Paulsen, he was walking normally. Dr. Paulsen found no evidence of numbness over his face, he found there were no complaints of cognitive impairment, and now plaintiff asserts that he can barely walk at all and is very, very severely cognitively impaired. Those are things that Dr. Paulsen would not have missed, Dr. Schaumburg testified, because a first year medical student would not miss them. Plaintiff was seen by a superb, very good neurologist at a time when his symptoms would have been very apparent because they are things that are very obvious and that are clearly, when plaintiff is examined, striking. Those symptoms would not have been missed.

On redirect examination, Dr. Schaumburg related that he and a colleague are editors of the textbook that is used in the field of neurotoxicology and he was familiar with the literature in the field of neurotoxicology. There is nothing in the reported literature that would suggest that a single dose, a very short-term exposure to an epoxy-like product, would produce such a delayed reaction and progressive reaction over such a long period of time as that experienced by plaintiff.

Upon questioning by the court, Dr. Schaumburg testified that in his opinion as a neurologist and based upon his review of Dr. Kilburn's deposition, he did not believe that Dr. Kilburn is qualified to give an opinion about medical causation in a toxic chemical case such as the one at bar.

The last witness presented by defendant ICI Americas, Inc., was Dr. Phillip Guzelian, a professor of medicine at the University of Colorado Health Science Center in Denver, Colorado. Dr. Guzelian received his medical training at the University of Wisconsin, served two years with the Na-

tional Institutes of Health, did additional training in internal medicine, liver disease and toxicology, at Yale University, and at the University of California in San Francisco. He was a faculty member of the Medical College of Virginia in Richmond, Virginia, and now has an academic practice. Dr. Guzelian's curriculum vitae was introduced into evidence as Defendant's Exhibit 4.

Dr. Guzelian testified that he is a board-certified internist with special training in liver disease, and he is a medical toxicologist. Dr. Guzelian related that toxicology is the study of the undesirable or unwanted effects of physical chemical agents in the environment and a medical toxicologist is one who approaches that problem from a human point of view, whereas a Ph.D. toxicologist tends to accentuate animal testing as the way of estimating adverse effects in humans or of establishing safety for humans.

Dr. Guzelian testified that he had reviewed the work done by Dr. Kilburn in this case, reviewed the methodology utilized by Dr. Kilburn, and concluded that the conclusion reached by Dr. Kilburn, that there was a cause and effect relationship between exposure to Rubiflex and plaintiff's neurologic condition, was not reached by the use of accepted scientific methodology.

Dr. Guzelian explained that an individual may be exposed to a chemical but he may not get a dose of the same, or if the individual did get a dose it might not be a dose of a magnitude that would result in an injury. Dr. Guzelian pointed out that although every substance is poisonous, it is the dose that determines whether the substance is toxic or not. In order to determine the toxicity of a chemical for a species or even in any experiment, the examiner must know something about the dose of that chemical. If the dose is high enough, any substance can be toxic. All chemicals are toxic, Dr. Guzelian testified, and instead of talking about toxic chemicals one should talk about toxic exposures and toxic doses of chemicals.

Dose response is absolutely fundamental to understanding the toxicity of any chemical, Dr. Guzelian testified. Dose can determine the frequency or intensity of an effect on a given organ system and the dose can also determine which organs are affected. Dr. Guzelian used the example of an aspirin as being beneficial to the cardiovascular system when used in small doses, as being beneficial to the musculoskeletal system in larger doses, but as causing ringing in the ears when the dose is sufficient to create an impact upon the auditory system. So, Dr. Guzelian testified, if he were to see a person who said they had ringing in the ears and he asked the patient if the patient had been exposed to aspirin and they said yes, without knowing more about dose, Dr. Guzelian pointed out that he would be in error if he made a conclusion that aspirin caused the ringing in the patient's ear. He would have to know that the dose was at least in an approximate range to make it an eligible candidate to explain the tinnitus, and as the dose of aspirin increases, the patient can have G.I. bleeding, the patient can get systemic acidosis, and then the patient can die. Thus, Dr. Guzelian testified, dose is fundamental. Without knowing the dose, it will almost always be impossible to specify toxicity. Dr. Guzelian further testified that there is a chronic threshold and there is an acute threshold, and both are well recognized for most chemicals in toxicology.

Dr. Guzelian testified that there are at least four steps that must occur before an individual can ever get injured from any chemical in the environment. These are mandatory steps, Dr. Guzelian testified, and if any of these steps are missing, it is unlikely that the individual can make a conclusive medical evaluation.

The first step is source, the chemical has to come from somewhere. Second, that source has to be released into an exposure. Next, the exposure has to turn itself into a dose. And finally, the dose has to be of a nature and a magnitude such that it is

capable of causing some defined health effect. Source is usually obvious, Dr. Guzelian testified, and in order to determine exposure, the examiner must carry out some kind of an experimental test. The examiner should measure and identify the chemical and the medium of exposure. In this case, the medium of exposure was mostly an air exposure case. The chemical was spilled into the air, and plaintiff claims that there was some inhalation, and there could have been some skin exposure as well. Next, the examiner must determine dose, and the best way to determine a dose is to individualize it by actually taking a sample, a biological sample, of blood or urine, exhaled breath, to determine the presence and the amount of the chemical inside the body. This is ordinarily done by making an exposure assessment, that is, making a model or predicted level of what the individual would have measured if the individual had a measurement device present when the exposure occurred. This is called a dose reconstruction, making assumptions in biologic models, coming up with an estimate of the amount of the chemical in the blood. Last of all, once that has been accomplished, the examiner defines the medical condition by doing regular medical testing as might be done in any doctor's office, and then carrying out a differential diagnosis to define the medical condition.

Dr. Guzelian explained that a differential diagnosis starts with collecting the medical data and then making a diagnosis. The examiner makes a list of all the recognized disease entities which could explain the medical data and then by a process of inclusion or exclusion, the examiner tries to come up with a diagnosis. Dr. Guzelian testified that in his profession as a medical toxicologist, once a diagnosis is reached by the process of differential diagnosis, he is asked to carry out causation analysis. That is, as a medical toxicologist, he would be asked whether it is possible that a patient who had exposure to a chemical could have developed a disease entity as a result of that exposure. Dr. Guzelian further explained that there is sometimes confusion between a differential diagnosis, that is, the process by which researchers actually define the person's disease medically, and causation analysis, which is identifying which of the known or suspected causes could explain the patient's illness. Consequently, Dr. Guzelian stated, it is logical that if you cannot make a diagnosis, it is almost impossible to come up with a causation, because the researcher does not know exactly what it is he is trying to prove the cause of.

In this case, Dr. Guzelian testified, it was not possible for Dr. Kilburn to make a valid causation analysis. In order to make such an analysis, you have to know the individual exposure and dose, you have to look at the time course of the relationship, and you have to know about alternative causes. There should also be coherence of the clinical and biological and mechanistic evidence to support the researcher's opinion. The first of these five criteria deal with general causation and the last four deal with specific causation, for a named individual. In order to show causation, the researcher must look at epidemiologic studies and show that there is a strength of an association, that is consistent, and then the researcher looks for specificity, dose response, and coherence. In addition, some researchers would add a control called confounders.

When asked about Dr. Kilburn's finding that the proof he has of the disease or of the injury to plaintiff was shown by the plaintiff himself, since he was exposed to Rubiflex and he is now ill, Dr. Guzelian stated that such a finding does not fit with anything that he testified about. This is circular reasoning, Dr. Guzelian pointed out, because it asserts that plaintiff became ill after being exposed to the chemical, he received enough exposure because he became ill, his illness was caused by his exposure, and you know that he was exposed because he became ill.

Dr. Guzelian further testified that there is an orderly manner for establishing general causation, the strongest evidence will

come from human studies, what researchers call epidemiology or clinical studies. The next strongest evidence will come from animal studies, and then the next strongest would be what are called test tube studies, experiments with single cells or tissues. Dr. Kilburn did not follow the generally accepted criteria for establishing individual causation in plaintiff's case, Dr. Guzelian testified, he did not know of any studies that supported his view of Rubiflex or of its components being capable of producing the particular neurologic condition, and general causation has not been demonstrated in this case. In addition, Dr. Kilburn has failed to establish individual causation because first of all, Rubiflex has not been identified as a substance that is capable of causing plaintiff's medical condition, the amount of exposure plaintiff received to Rubiflex is unknown, and Dr. Kilburn had no idea of the amount of the dose plaintiff received. In regard to analyzing data, Dr. Kilburn admitted that he did not know either the amount of the exposure or the dose plaintiff received and did not explore alternative causes. In addition, coherence is lacking in Dr. Kilburn's analysis considering that the injury to the plaintiff was unilateral, it was local, it changed, and it did not have the right timing. Thus, Dr. Guzelian testified, in his opinion as a medical toxicologist causation has not been demonstrated in this case.[6]

On cross-examination, Dr. Guzelian admitted that he had not examined plaintiff, did not believe that it was necessary for him to examine plaintiff to analyze the methodologies he has analyzed in this case, and did not believe that an examination was necessary to evaluate Dr. Kilburn's methodology. If he were asked to form a causation conclusion on his own, Dr. Guzelian testified, he would have to use the same rules which he described during the course of his testimony to reach a valid causation conclusion.

Dr. Guzelian further testified that whether Dr. Kilburn's conclusions are correct or incorrect, he reached them for the wrong reasons. Dr. Guzelian stated that he did not believe that an individual could conclude causation to a reasonable degree of medical certainty in the absence of requisite data. If an examiner cannot determine the dosage, then the researcher cannot come to an opinion of causation to a reasonable degree of medical certainty. Dr. Guzelian stated that there was no reason for Dr. Kilburn to take a blood sample two and one-half months after plaintiff's exposure, because the chemical would have dissipated and the test would not have been useful.

On redirect examination, Dr. Guzelian pointed out that if you cannot take biologic samples, researchers construct models, make hypotheses, make calculations of what the exposure would have been and seek to reconstruct the accident. Dr. Guzelian pointed out that EPA uses modeling techniques when they measure things at Superfund sites and they use assumptions, wind models, groundwater models, to estimate exposure. In this case, there had been no estimation or modeling done.

## V.

### PLAINTIFFS' REBUTTAL

Plaintiff recalled Dr. Kilburn at the *Daubert* hearing who pointed out that in his first report of February 16, 1996, he reported that plaintiff developed pain in his face and arm within fifteen minutes of his exposure to Rubiflex and that this pain had never gone away completely. Dr. Kilburn stated that defendants' assertion that plaintiff did not have symptoms for two and a half months is corrected by that information. Secondly, Dr. Kilburn testified, about two months after his exposure, which would have been approximately mid-December, plaintiff began having trouble

---

6. The slides utilized by Dr. Guzelian in his oral testimony were introduced into evidence as collective Exhibit 5.

walking and falling, and Dr. Kilburn noted that in his initial report and further noted that such symptoms take time to develop. Therefore, Dr. Kilburn concluded, the idea that this type of chemical exposure cannot do substantial damage to the nervous system without prolonged or repeated exposure is "just dead wrong." Dr. Kilburn reported that he had studied fourteen firemen who were exposed to a fire explosion in a transformer room in Shreveport, Louisiana, which exposed them to very high concentrations of PCBs and products of PCBs that are neurotoxic such as dibenzophurans, and that exposure was verified by blood samples which were taken and reserved and later analyzed. The men had profound balance problems and they were never able to be certified to go back to fighting fires because they could not drive with safety or go up a ladder with safety. This was a single exposure to PCB and chemical damage can occur from a single dose and can be devastating to the nervous system. It is not a matter of aggregation or effect over months or years, Dr. Kilburn testified, and it can occur from a single time, and he had observed it with epoxies. The burning experienced by the plaintiff was evidence that nerves were irritated and neurological responses such as itching and burning come from nerves, and the easiest way to get such a response is to put the chemical on the nerves.

In response to Dr. Schaumburg's conclusion that Dr. Kilburn is not qualified to give expert testimony in the field of neurotoxicology, Dr. Kilburn testified that he had worked with patients who developed a sensitivity to a particular chemical because of an amplifier similar to an individual receiving a bee sting and then becoming very ill with subsequent bee stings. The bee sting protein is acted upon by the immune system which prepares to act more quickly and more viciously in response to the next bee sting and that is exactly what the immune system has been built for, for defense. In this case, however, it turns out that the defense is potentially fatal and in some instances lower and lower doses of a substance, down to an amount that is scarcely detectible by the most sensitive devices, can invoke a reaction. Dr. Kilburn further testified that it is the experiences he has had and various articles and experiments he has seen through the years, as opposed to learning about this field in school itself, that made him feel qualified to testify in the field of neurotoxicology. Dr. Kilburn stated that he was well educated in chemistry and pharmacology and believes that he is as qualified to testify in the fields of pharmacology or toxicology as a Ph.D. – M.D. in the area due to his experience and training.

Dr. Kilburn testified that he had not heard anything from any of the defendants' witnesses that shook his confidence in the procedures that he followed and the opinions he had reached in this case and noted that neither Dr. Schaumburg nor Dr. Masur had any argument with his observations, their arguments were on details concerning whether he was capable of doing the measurements. The measurements speak for themselves, Dr. Kilburn stated, and this case boils down to an interpretation problem of what those observations mean. While it is possible that plaintiff had an undiagnosed disease which was not uncovered until he got the exposure, it is much more likely that it is a condition that came on when his pain started, and was directly related to the exposure that caused the pain.

On cross-examination once again, Dr. Kilburn testified that plaintiff was examined by Dr. Paulsen in January of 1996, who found no neurological problems with his gait or his walk. Dr. Kilburn noted, however, that Dr. Paulsen examined plaintiff on an examining table and did not get him up to walk. Plaintiff experienced some skin problems immediately after his exposure to Rubiflex, but he did not complain of any neurological problems such as the ptosis or blurred vision until December 21, 1995.

## VI.

### *DEFENDANTS' MOTION FOR RECOVERY OF COSTS*

On the issue of Dr. Kilburn's failure to show up for the first scheduled *Daubert* hearing, Dr. Kilburn referred to his affidavit stating that he was appearing as a witness in a case in Texas and did not have any way of knowing that he would not be able to get to Knoxville when this *Daubert* hearing was originally set. Dr. Kilburn testified that he finished his cross-examination in the case in Texas at mid-day on the day that he was supposed to be here at 9:00 a.m., a Friday, and he could not leave the courtroom earlier. The witnesses before Dr. Kilburn went slowly, and when he got on the stand at the end of a full day, his direct and cross-examination was not completed for the next full day and three and a half hours into the following day.

Dr. Kilburn testified that he in fact had made arrangements to go back to Los Angeles and then repurchased a ticket that would have gotten him from Los Angeles to Knoxville, and he thought that he had a full day to travel to Knoxville. He could not use his ticket that he had purchased, and had to be reticketed to go back to Los Angeles. Dr. Kilburn testified that he made arrangements to fly directly from Texas to Knoxville to be here for the *Daubert* hearing, he had reservations for Thursday evening to come through Atlanta to Knoxville, but his testimony was not completed on Thursday.

During cross-examination on this issue, Dr. Kilburn testified that he went to Texas on Monday to be prepared to give testimony on Tuesday. The trial was already underway and he planned to testify on Tuesday and Wednesday, fly back to Los Angeles on Wednesday night, and then fly from Los Angeles to Knoxville on Thursday to testify on Friday in this case. He thought that he would be able to complete his testimony on Wednesday, but that did not occur.

## VII.

### *RELEVANT AUTHORITIES*

Federal courts sitting in diversity apply state substantive law and federal procedural law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Federal diversity jurisdiction provides an alternative forum for the adjudication of state created rights, but it does not carry with it generation of rules of substantive law. The United States Supreme Court ruled in *Erie* that except in matters governed by the federal constitution or by acts of Congress, the law to be applied in any case is the law of the state. Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 2219, 135 L.Ed.2d 659 (1996).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that trial judges were required to make an initial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. This two-step inquiry requires the trial judge to assess the relevance and the reliability of the expert's testimony. The relevance requirement directs that there be a "fit" between the testimony and the issue to be resolved by the trial. *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993). The reliability requirement is designed to focus on the methodology and principles underlying the testimony. *United States v. Bonds*, 12 F.3d at 556. *Greenwell v. Boatwright*, 184 F.3d 492, 495–96 (6th Cir. 1999).

The purpose of a *Daubert* hearing is to determine "the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594–95,

113 S.Ct. 2786. The Supreme Court has instructed in *Daubert* that courts are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning. If the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions, and conclusions derived therefrom are scientifically valid as well. *Greenwell*, 184 F.3d at 496.

▇▇▇ The Sixth Circuit Court of Appeals noted in *United States v. Harris*, 192 F.3d 580 (6th Cir.1999) that although *Daubert* was restricted by its facts to scientific testimony, the Sixth Circuit has broadly applied *Daubert's* relevance and reliability analysis to all evidence offered under Rule 702, Federal Rules of Evidence. Moreover, the United States Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999), recently broadened the *Daubert* analysis to specifically include "technical" as well as "other specialized knowledge." Judge Merritt, in his dissenting opinion in *Greenwell v. Boatwright*, *supra*, observed that the Sixth Circuit has long required judges to give a "hard look" and carefully assess the scientific conclusions and reasoning of experts because jurors are frequently overly impressed by conclusory opinions of scientific experts paid by a party. *See, Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1352 (6th Cir.1992). Today, Judge Merritt observed, trial judges have an unequivocal duty to give careful scrutiny to the testimony of paid experts in order to avoid verdicts based on "junk science." As the Supreme Court again stated this past term, Judge Merritt further observed, Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge to 'insure that any and all scientific testimony . . . is not only relevant, but reliable,'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–149, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), *quoting Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. Under *Daubert*, trial judges must act as "gatekeepers" to undertake a "preliminary assessment of whether the reasoning or methodology underlying [expert]

testimony is scientifically valid." 509 U.S. at 592–93, 113 S.Ct. 2786. Thus, trial judges must be on guard against all forms of junk science that may creep into the courtroom. *Greenwell*, 184 F.3d at 501 (Merritt, J., dissenting).

In *Daubert*, the United States Supreme Court suggested four nonexclusive questions for judges to consider when admitting scientific evidence: (1) Is it testable and has it been tested? (2) Has it been subjected to peer review? (3) What is the potential rate of error? (4) Is the technique widely accepted in the relevant scientific community? A fifth factor has been added to the Supreme Court's list by a number of the circuits considering expert testimony, including the Sixth Circuit Court of Appeals: "Whether the experts are proposing to testify about matters growing naturally and directly out of research they have concluded independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," because the former "provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk Southern Railway*, 105 F.3d 299 (6th Cir.1997). In *Smelser*, the Sixth Circuit reversed the trial court because the trial court allowed plaintiff's expert to offer his opinion that a defective shoulder belt in the company pickup truck, and not a rear-end collision, caused the employee's back injuries and aggravated his neck injuries. The trial court failed to adequately assess the reliability of the methodology underlying the expert's opinions both as to defect and causation and also failed to recognize that the expert's opinion as to the cause of the plaintiff's specific injuries went beyond his expertise in biomechanics. Thus, the court ruled the trial court failed to adequately perform its gatekeeping functions as defined by the Supreme Court in *Daubert*.

The Sixth Circuit initially noted that under *Daubert*, the trial judge, when performing the gatekeeping function, must use a two-step inquiry which examines the

expert's opinion testimony for reliability and relevance. First, the court is to determine "whether the expert's testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" An expert opinion that is based on scientifically valid principles will satisfy Rule 702, Federal Rules of Evidence; an expert's subjective belief or unsupported speculation will not.

Secondly, the Sixth Circuit ruled, the court "must insure that the proposed expert testimony" is relevant to the task at hand. When considering reliability, the trial court must focus on the soundness of the expert's methodology and not the correctness of his conclusions. The trial court in *Smelser* failed to consider any of these factors, the Sixth Circuit ruled, and reversed the judgment for the plaintiff.

The Sixth Circuit Court of Appeals has stated that the Tennessee law of products liability, as interpreted by the Tennessee courts, sets a "fairly stiff standard." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir.1991). An excellent analysis of the Tennessee Products Liability Act is contained in the Tennessee Supreme Court decision of *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn.1996), wherein the Tennessee Supreme Court explained that both a consumer expectation test and a prudent manufacturer test is provided for under the Tennessee Products Liability Act's definition of "unreasonably dangerous." *Id.* at 531–32. The Tennessee Products Liability Act also provides that the term, "defective condition," means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption. Tenn.Code Ann. § 29–28–102. Whether the consumer expectation test or the prudent manufacturer test is utilized, however, the Tennessee Supreme Court has ruled that the burden remains on plaintiff in a products liability action to establish injury as a result of a defective or unreasonably dangerous product. *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d at 533; *Goins v. Clorox Co.*, 926 F.2d at 561; *see also, Browder v.*

*Pettigrew*, 541 S.W.2d 402 (Tenn.1976); *Ford Motor Company v. Lonon*, 217 Tenn. 400, 398 S.W.2d 240 (1966); *Olney v. Beaman Bottling Co.*, 220 Tenn. 459, 418 S.W.2d 430 (1967); Restatement (2d) Torts § 402A.

■ Thus, under Tennessee law, even if plaintiffs can establish that Rubiflex is defective and/or unreasonably dangerous, this alone is not enough to establish liability. Plaintiffs must prove that the defect or fact that the product is unreasonably dangerous proximately caused plaintiffs' claimed injuries. *Goins v. Clorox Co.*, 926 F.2d at 561. As pointed out by the Sixth Circuit Court of Appeals, under Tennessee law a products liability plaintiff must always prove that the unreasonably dangerous or defective condition was the proximate cause of the injury. *Cansler v. Grove Mfg. Co.*, 826 F.2d 1507 (6th Cir. 1987); *Ricker v. Zinser Textilmaschinen GmbH*, 506 F.Supp. 3 (E.D.Tenn.1978) ("to establish the liability of the defendant, it was incumbent upon the plaintiffs to prove in addition that the defective condition ... proximately caused the plaintiffs' injuries and damages ...").

The Sixth Circuit Court of Appeals dealt with this same standard, although applying Ohio law, in *Conde v. Velsicol Chemical Corp.*, 24 F.3d 809 (6th Cir.1994). In that case, the plaintiffs alleged that Velsicol's commercial termiticide was a defective product that caused health problems and a loss of property value after it was applied to the basement area of the plaintiffs' home. The district court found that most of the expert testimony offer by the Condes with respect to the issue of medical causation was inadmissible, and further found that, even if it were admissible, the testimony was insufficient to allow a jury to conclude by a preponderance of the evidence that the Condes suffered personal injuries as a result of their exposure to the termiticide. As do the plaintiffs in this case, plaintiffs in the *Conde* decision sought to recover damages resulting from the defendant's marketing of a defective

and dangerous product and also sought punitive damages from defendant for manufacturing a known defective product and for failing to report adverse testing results. The trial court granted summary judgment for the defendant on the issues of medical causation and product defect, ruling, in regard to medical causation, that the testimony of three of the plaintiffs' experts was inadmissible under Rules 702 and 703, Federal Rules of Evidence, and finding that even if their testimony had been admissible, it was insufficient to allow a jury to find, by a preponderance of the evidence, that defendant's termiticide caused the plaintiffs' health problems.

On the issue of product defect, the trial court applied the two prong consumer expectation/risk benefit analysis required by Ohio law and entered summary judgment on both prongs of the test. On the issue of medical causation, the court noted that the plaintiffs' three expert witnesses were not medical doctors and thus were unqualified to render differential diagnosis of medical conditions and that Dr. Conde, a family practitioner, was the only medical doctor to testify for the plaintiffs despite the fact that a number of specialists had provided extensive medical care to the family (Dr. Conde was also one of the plaintiffs). The trial court refused to accept Dr. Conde's expert opinion because the scientific literature he cited did not support his conclusions. The Sixth Circuit affirmed the trial court.

Relying upon its earlier decision in *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992), the Sixth Circuit stated that the Condes' non-medical experts could only state, as did the experts in *Turpin* with respect to Bendectin and birth defects, that chlordane exposure "is consistent with" the Condes' observed symptoms. The court further noted that plaintiffs' non-medical experts were unable to exclude other potential causes for plaintiffs' symptoms and their theories were inconsistent with the negative chlordane test results of the Condes' tissue and the vast

majority of the relevant, peer reviewed scientific literature. Dr. Conde, the only medical doctor to testify, the Sixth Circuit stated, did not testify on the basis of the collective view of his scientific discipline, nor did he take issue with his peers and explain the grounds for his differences. The Sixth Circuit ruled, "In sum, the 'analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide'" (citation omitted). *Conde v. Velsicol Chemical Corp.*, 24 F.3d at 814. Accordingly, the Condes' expert testimony was insufficient to permit a jury to conclude, by a preponderance of the evidence, that chlordane exposure caused the Condes' health problems. *Id.*

The Fifth Circuit Court of Appeals was presented with a case very similar to the one at bar in *Moore v. Ashland Chemical Inc.*, 126 F.3d 679 (5th Cir.1997). Although this decision is from a sister circuit, its thoughtful and thorough analysis of the manner in which trial courts should approach scientific or technical evidence utilizing the *Daubert* guidelines is instructive in analyzing the case at bar. In that case, the Fifth Circuit, sitting en banc, held that a district court did not abuse its discretion in excluding the opinion of a physician on the causal relationship between plaintiff's exposure to industrial chemicals and his pulmonary illness. A panel of the Fifth Circuit had reversed the trial court and determined that it should not have excluded the expert's testimony (*Moore v. Ashland Chemical, Inc.*, 126 F.3d 679 (5th Cir.1997)). In the en banc decision, the majority noted initially that the proffered expert witness, Dr. Jenkins, was highly qualified and was allowed to testify about his examinations of plaintiff, the tests he ran, and the diagnosis he reached. His expert opinion as to the causal relationship between plaintiff's exposure and plaintiff's pulmonary illness was excluded by the trial court and affirmed by the Fifth Circuit sitting en banc.

In *Moore*, the plaintiff was a delivery truck driver who delivered several drums of chemicals manufactured by Dow Corning Corporation to Ashland Chemical Inc. When the plaintiff opened the back door of his trailer, he smelled a chemical odor that caused him to suspect that a drum was leaking. Plaintiff then contacted the plant manager for Ashland and he and plaintiff identified two leaking drums and removed them from the trailer. The manager of the Ashland plant contacted Dow and requested cleanup instructions and a copy of the material safety data sheet (MSDS) for the spilled chemicals. The MSDS identified the contents of the leaking drum and the health hazards associated with the contents and indicated that the chemical solution included hazardous ingredients, most notably Toulene. It warned that depending upon the level and duration of the exposure to fumes from the chemicals, irritation or injury to various organs, including the lungs, could result.

After the plant manager and plaintiff obtained cleanup instructions, they put the leaking drums into larger salvage drums, placed absorbent material on the spilled chemicals, swept them up, and disposed of them. The men were engaged in this cleanup for forty-five minutes to an hour. Plaintiff testified at trial that about an hour after finishing the cleanup, he began experiencing symptoms, including dizziness, watery eyes, and difficulty in breathing. Plaintiff consulted his family physician and was referred to a pulmonary specialist, Dr. Daniel E. Jenkins.

Plaintiff was not provided with any safety devices during the cleanup of the chemical, such as a respirator, and became disabled within three months. He was also a smoker for more than twenty years, had childhood asthma, and was just getting over pneumonia at the time of his exposure to the chemical. Dr. Jenkins examined the plaintiff, ran tests on the plaintiff, and reviewed his medical history. Dr. Jenkins diagnosed reactive airway disfunction syndrome (RADS), and was prepared to testify that plaintiff's Toulene exposure caused plaintiff's illness and injuries. Dr. Jenkins was recognized by all parties as an expert in pulmonary diseases.

In analyzing whether to allow Dr. Jenkins to testify, the trial court determined that Dr. Jenkins had relied upon the manufacturer's material safety data sheet (MSDS) indicating that Toulene could cause injury to the lungs, plaintiff's onset of symptoms within one hour, the fact that plaintiff had one case study dealing with Toulene exposure in a small room, Dr. Jenkins' training and experience, his examination and test results of the plaintiff, and Dr. Jenkins' assertion that there was no practical way to run scientific studies on such a chemical exposure. The defendant, on the other hand, sought to exclude Dr. Jenkins' testimony because this was the first case that Dr. Jenkins had treated for RADS with a history of Toulene exposure, Dr. Jenkins had done no research on the subject, and the one case he was familiar with (a reported case of exposure by an individual to Toulene for two and one-half hours in a small room) had speculative conclusions according to the author of the case study, and there was no logical, scientific basis for Dr. Jenkins' conclusion other than his opinion.

The Fifth Circuit Court of Appeals eliminated the case study relied upon by Dr. Jenkins because the authors of the case study had stated that their conclusions were speculative and because in the single study involving exposure to Toulene fumes, the level and duration of the exposure were several times greater than plaintiff's exposure. Thus, the Fifth Circuit ruled, other than his examination of the plaintiff, Dr. Jenkins' causation opinion was based upon: (1) the MSDS from which Dr. Jenkins could have gleaned that the contents of the drum were irritating to the lungs at some level of exposure; and (2) the relatively short time between plaintiff's exposure to the chemicals and the onset of his breathing difficulty. As to the first basis for his proposed opinion, the Fifth Circuit noted that Dr. Jenkins did not know what tests had been conducted in

generating the MSDS, and had no information on the level of exposure necessary for a person to sustain the injuries about which the MSDS warned. In regard to the second basis for the proffered expert opinion, the court ruled that reliance on the temporal proximity between exposure and injury is not sufficient to support a finding of proximate causation in the absence of an established scientific connection between exposure and illness, or compelling circumstances which allow the court to dispense with the need for reliance on standard methods of toxicology. The temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation, the Fifth Circuit ruled.

Moreover, the Fifth Circuit noted, Dr. Jenkins offered no scientific support for his general theory that exposure to Toulene solution at any level would cause RADS. Because he had no accurate information on the level of plaintiff's exposure to the fumes, Dr. Jenkins necessarily had no support for his theory that the level of chemicals to which plaintiff was exposed caused RADS. In addition, the Fifth Circuit noted, Dr. Jenkins made no attempt to explain his conclusion by asserting that the Toulene solution had properties similar to another chemical exposure to which RADS had been scientifically linked. Several post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one, the Fifth Circuit observed, and to support a conclusion based on such reasoning, the extrapolation or leap from one chemical to another must be reasonable and scientifically valid. *See Wheat v. Pfizer, Inc.,* 31 F.3d 340, 343 (5th Cir.1994); *see also Braun v. Lorillard Inc.,* 84 F.3d 230, 235 (7th Cir.1996); *Daubert II,* 43 F.3d at 1319; *Cavallo v. Star Enter.,* 892 F.Supp. 756 (E.D.Va.1995), *aff'd in part,* 100 F.3d 1150 (4th Cir.1996).

In the end, the Fifth Circuit concluded, Dr. Jenkins was relegated to his fall-back position that any irritant to the lungs could cause RADS in a susceptible patient. Dr. Jenkins cited no scientific support for this theory, however, and none of *Daubert's* factors to assess whether the opinion is based on sound scientific principles were met. Accordingly, the Fifth Circuit affirmed the decision of the trial court to exclude Dr. Jenkins' testimony.

## VIII.

### THE CASE AT BAR

Plaintiffs have filed suit against the defendants alleging that both defendants were negligent and that defendant ICI Americas, Inc. (ICI) manufactured and sold an unreasonably dangerous product for which defendant ICI is strictly liable under the Tennessee Products Liability Act of 1978, Tenn.Code Ann. § 29–28–101, et seq. Defendants have moved to exclude the testimony of plaintiffs' expert, Kaye H. Kilburn, M.D., asserting that Dr. Kilburn's opinions do not satisfy the legal requirements established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that Dr. Kilburn is not qualified to testify about Rubiflex.

Dr. Kilburn's testimony is critical to the plaintiffs in this case inasmuch as, under Tennessee law, even if plaintiffs can establish that Rubiflex is defective and/or unreasonably dangerous, plaintiffs must also prove that the defect or fact that the product is unreasonably dangerous proximately caused plaintiffs' claimed injuries. *Goins v. Clorox Co.,* 926 F.2d at 561; *Cansler v. Grove Mfg. Co.,* 826 F.2d 1507; *Ricker v. Zinser Textilmaschinen GmbH,* 506 F.Supp. 3. Dr. Kilburn proposes to testify as to causation in this case, both as to general causation and as to specific or legal causation. This court must determine whether Dr. Kilburn's proposed expert testimony is both relevant and reliable and should be admitted into evidence and presented before the jury who hears this case. The factors enunciated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* regulating the admissibility of scientific

testimony, and extended to technical testimony by the recent decision of the United States Supreme Court in *Kumho Tire Co.*, must be examined by the court in determining whether Dr. Kilburn's testimony is both relevant and reliable and admissible into evidence under Rule 702, Federal Rules of Evidence. In making this determination, the court cannot be concerned with the conclusions reached by Dr. Kilburn, but must be concerned with "the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie" Dr. Kilburn's proposed conclusions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 594–95, 113 S.Ct. 2786. The principles to guide this court in this undertaking, as set forth by the Supreme Court and refined by the Sixth Circuit Court of Appeals, are: (1) Are Dr. Kilburn's conclusions testable and have they been tested? (2) Have Dr. Kilburn's theories and conclusions been subjected to peer review? (3) What is the potential rate of error? (4) Are the techniques utilized by Dr. Kilburn widely accepted in the relevant scientific community? and (5) Is Dr. Kilburn proposing to testify about matters growing naturally and directly out of independent research or generated for the instant litigation? *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; Kumho Tire Co. v. Carmichael, supra; Smelser v. Norfolk Southern Railway, supra.*

■ Initially it must be noted that plaintiffs, as the proponents of Dr. Kilburn's testimony, have the burden of establishing that Dr. Kilburn's testimony is admissible at trial. Rule 104(a), Federal Rules of Evidence, states that preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b), dealing with when the relevancy of evidence depends upon the fulfillment of a condition of fact. *Smelser v. Norfolk Southern Railway*, 105 F.3d at 303 (*citing Daubert II*, 43 F.3d at 1316).

Following these principles, this court must determine whether the proffered testimony is both relevant and reliable. The reliability of the proffered testimony must involve an initial determination that the witness seeking to render the opinion is qualified to render an expert opinion in the designated area. Second, the court must determine whether the proffered testimony is "reliable" in the sense that the testimony is grounded upon sound principles, whether scientific, technical, or relating to other specialized knowledge. *Greenwell v. Boatwright*, 184 F.3d at 495–96.

## A. Methods of Toxicology

Dr. Phillip Guzelian, a professor of medicine at the University of Colorado Health Science in Denver, Colorado and a medical toxicologist, established with direct testimony that pursuant to the generally accepted methods of conducting a toxicological investigation, the expert must identify the source, exposure, dose, and medical condition of the affected individual. The source of the chemical substance in issue must be identified, there must an opportunity for physical contact with the chemical in issue, the amount of the chemical to which the individual is exposed must actually penetrate a portal of entry into the human body, and if exposure occurs and a dose is received, then the dose must be of sufficient magnitude to cause a medical condition such as a sign, symptom, abnormal laboratory finding or diagnosed disease.

The chemical must come from a source, that source has to be released into an exposure, that exposure has to turn into a dose, and the dose has to be of a nature and magnitude such that it is capable of causing some defined health effect. The source of the chemical exposure is usually obvious, and the examiner should measure and identify the chemical and the medium of exposure. The examiner must then determine the dose to which the individual was exposed, either by taking a biological sample, such as blood or urine or exhaled

breath, or by making an exposure assessment. That is, making a model or predicted level of what the individual would have measured if the individual had a measurement device present when the exposure occurred. This is called a dose reconstruction, making assumptions in biologic models, and coming up with an estimate of the amount of the chemical to which the individual was exposed.

Last of all, once that has been accomplished, Dr. Guzelian testified, the examiner defines the medical condition by doing regular medical testing as might be done in any doctor's office, and then carrying out a differential diagnosis to define the medical condition. Making a differential diagnosis starts with collecting the medical data and then making a diagnosis, and making a list of all the recognized disease entities which could explain the medical data and then by a process of inclusion or exclusion, the examiner tries to come up with a diagnosis. Once a diagnosis is reached by the process of differential diagnosis, the examiner may be required to carry out causation analysis. That is, Dr. Guzelian testified, a medical toxicologist would be asked whether it is possible that a patient who had exposure to a chemical could have developed a disease entity as a result of that exposure. There is sometimes confusion between a differential diagnosis, the process by which researchers actually define the person's disease medically, and causation analysis, which is identifying which of the known or suspected causes could explain the patient's illness. Consequently, Dr. Guzelian testified, it is logical that if you cannot make a diagnosis, it is almost impossible to come up with causation, because the researcher does not know exactly what it is he is trying to prove the cause of.

### B. *Dr. Kilburn's Methodology*

In this case, Dr. Kilburn ignored many of the accepted methods of toxicology. He did know the source of the Rubiflex, and plaintiff established that he received an exposure to the chemical mixture. Dr. Kilburn had no idea of the amount of the chemical to which plaintiff was exposed, nor did he have any idea if the dose received by the plaintiff was sufficient to cause a medical condition. Dr. Kilburn examined the plaintiff on one occasion on February 13, 1996, approximately four months after plaintiff's exposure to Rubiflex on October 10, 1995. Dr. Kilburn examined plaintiff and performed physical and psychological testing and reviewed with plaintiff whether he had any preexisting impairments and his medical history.

As to the dose of plaintiff's exposure to Rubiflex, Dr. Kilburn replied, "Oh, is that really a pertinent question? We know that for Andrew Downs, he received enough, and as my pharmacology professor, Louis Goodman, replied when asked what was the proper dose of the drug, he would say enough to do the job you are looking to get done. And, you know, if the job was to cripple Andrew Downs, then he got the dose that would do that." Dr. Kilburn testified that plaintiff's medical history was consistent with his findings, but admitted that he was not acquainted with the particular chemicals within the chemical mix of Rubiflex. He got information about Rubiflex later, Dr. Kilburn testified. In fact, Dr. Kilburn testified, he found that it was better for him to not know much about a chemical before he conducted his examination so he would not build preconceived notions before he tests a patient which influence his findings adversely or unpositively.

Dr. Kilburn then looked for an association that would be plausible and logical and ruled out those that were less logical and less plausible, coming down to a single exposure, brief as it was, which was direct by contact and inhalation and made a reasonable conclusion of causation and effect. Dr. Kilburn concluded that the exposure to the chemical caused the result which he observed, and testified that his conclusion was within a reasonable degree of medical and scientific certainty.

At a later time, Dr. Kilburn did get information about the chemicals in Rubi-

flex, but he had not been able to draw a conclusion within a reasonable degree of medical scientific certainty as to what in the Rubiflex may have caused the injury received by plaintiff.

Dr. Kilburn admitted in his testimony that at the time he made his diagnosis of plaintiff, he had not seen any of plaintiff's medical or employment records, had not reviewed the MSDS for Rubiflex or its constituents, was not aware of the amount of Rubiflex plaintiff had been exposed to, had not performed any animal studies with Rubiflex, and did not know if any such studies had been performed with the exact components of Rubiflex. He was further not aware of the dosage of Rubiflex received by plaintiff and had not done any testing or modeling to calculate plaintiff's exposure to Rubiflex. Dr. Kilburn further testified that he agreed with the statement made in his deposition that he had found no scientific or medical literature suggesting that Rubiflex could lead to neurological problems, but stated that the injury received by plaintiff demonstrated that Rubiflex exposure resulted in plaintiff's injury. Dr. Kilburn did state in his testimony and in his expert report of July 28, 1998, that he mentioned diisocyanates, but he did not know if diisocyanates was a component of Rubiflex. He further admitted that the article referred to in his expert report relating to dissocyanates discussed respiratory problems caused by chemicals, but that the pulmonary function test administered by Dr. Kilburn on plaintiff was normal.

## C. *"Red Flags" Under Daubert*

▪ In essence, Dr. Kilburn's expert opinion relating to causation rests upon: (1) Rubiflex is a chemical compound; (2) plaintiff was exposed to Rubiflex on October 10, 1995; (3) plaintiff experienced a reaction to his exposure for which he was treated by his family physician; and (4) Dr. Kilburn's examination and testing of plaintiff. Dr. Kilburn has no idea of the dose of the chemical received by plaintiff, and he has no idea if the dose was of sufficient magnitude to cause a medical condition. A recent treatise commenting upon the admission of expert testimony following the Supreme Court's decision in *Daubert* indicates that there are seven "red flags" which should cause concern for the trial court, as gatekeeper, in admitting expert scientific (and now technical) testimony. None of these factors is dispositive, the treatise stipulates, but each has been considered as cutting against admissibility.

1. *Improper extrapolation.* That is, leaping from an accepted scientific premise to an unsupported conclusion. An example of improper extrapolation is an expert's use of structure analysis where there is no demonstrated connection between a certain chemical substance and a certain injury, but there is a demonstrated connection between a similar chemical substance and that injury. For example, there is no scientifically demonstrable connection between Bendectin and birth defects; but there is scientific evidence that substances with a chemical structure similar to that of Bendectin causes birth defects. Thus, the expert employing structure analysis reasons that substances with similar chemical structures cause similar injuries. But this reasoning is not consistent with the scientific method because even minor changes in molecular structure can alter a substance's effect. The metabolic process stands as an unknown intervening variable between the original chemical structure and the adverse effect. Joseph Sanders, Scientific Validity, Admissibility and Mass Torts After *Daubert*, 78 Minn.L.Rev. 1387, 1409 (1994). Similarly, it is improper extrapolation to conclude, without any supporting research, that a substance that causes one harm also causes a different harm. *See, Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594 (9th Cir.1996); *Schudel v. General Electric Co.*, 120 F.3d 991 (9th

Cir.1997); *Cavallo v. Star Enter.*, 892 F.Supp. 756 (E.D.Va.1995) *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir.1996).

2. *Reliance on anecdotal evidence.* That is, basing an expert opinion upon the expert's own experience or on a few case studies. For example, in *Cavallo v. Star Enter.*, 892 F.Supp. 756 (E.D.Va.1995), *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir.1996), the plaintiff alleged that she suffered respiratory illness as a result of exposure to aviation jet fuel vapors that were released from overflow at the defendant's storage terminal. Plaintiff's expert toxicologist relied on case studies in which people who were exposed to the organic compounds in jet fuel suffered respiratory illnesses, although most of the illnesses were temporary. The court prohibited plaintiff's expert from offering testimony because reliance on these studies to form a conclusion was inconsistent with the scientific method. The court ruled that "case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation." Importantly, the treatise reflects, the court noted that the toxicologist did not purport to follow the methodology ordinarily followed by toxicologists. Rather, he formed his opinion "and then tried to conform it to the methodology." *See also, Casey v. Ohio Med. Prods.*, 877 F.Supp. 1380 (N.D.Cal.1995).

3. *Reliance on temporal proximity.* That is, relying too heavily upon an individual's prior good health and the temporal proximity between the ingestion of a substance and the development of a subsequent illness. Forming a conclusion on the basis of temporal proximity, in the absence of some established scientific connection between substance and illness, is inconsistent with the scientific method because the expert fails to consider other possible explanations—not to mention the unexplainable—that a scientist would want to look into before drawing a conclusion.

4. *Insufficient information about the case.* That is, relying upon proper methodology but failing to connect it with the facts of the case. This is similar to the "fit" requirement of *Daubert*, wherein the Supreme Court stated that a scientific principle may be valid for one purpose but not for another. The principle, though valid, might not "fit" the facts of the case at bar. For example, in *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F.Supp. 341 (S.D.Fla.1993), the court granted summary judgment after holding inadmissible plaintiff's expert testimony that Retin–A caused the plaintiff's birth defects. Plaintiff's mother had used Retin–A topically for skin blemishes during her pregnancy. Some studies tended to show a connection between a product similar to Retin–A and birth defects, but only when the product was taken orally and in large doses. Plaintiff's expert did not know how much Retin–A plaintiff had applied to her skin during pregnancy, however, and it was clear that the amount could not have approached the dosages in the studies relied upon by the expert. *See also, Bogosian v. Mercedes–Benz of North America, Inc.*, 104 F.3d 472 (1st Cir.1997); *Sorensen By and Through Dunbar v. Shaklee Corp.*, 31 F.3d 638 (8th Cir.1994).

5. *Failure to consider other possible causes.* That is, reaching a conclusion before the expert makes a reasonable attempt to eliminate some of the most obvious causes. In medical terms, this is called conducting a differential diagnosis, e.g., excluding other causes, such as genetics or other toxins, for a certain disease. In epidemiological terms, this is also controlling for confounding factors. For example, in *Claar v. Burlington N.R.*, 29 F.3d 499 (9th Cir.1994), plaintiffs brought an action under FELA alleging that they were injured by exposure to toxic chemicals. Plaintiff's experts had concluded that plaintiff's injuries were caused by exposure to toxic chemicals, but they neglected to investigate any other possible causes of the plaintiff's injuries. The Ninth Circuit Court of Appeals held that, "coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method. Certainly, scientists may form an initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Claar v. Burlington N.R., supra. See also, In re: Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994).

6. *Lack of Testing.* That is, failing to test the hypothesis the expert relies upon. As pointed out by the treatise, if the expert has not even tested the hypothesis he is testifying to, this is considered an extremely negative factor. Although the problem ordinarily arises in product liability cases where the plaintiff calls an expert to testify about an alternate design, the treatise points out that it

also has applicability to expert testimony in general. While testing should not be an absolute requirement to the admissibility of expert testimony on design safety, the treatise states, it should be supported by some testing, tests conducted by others, or by relevant literature. *See, e.g., Cummins v. Lyle Indus.,* 93 F.3d 362 (7th Cir.1996); *Tassin v. Sears, Roebuck & Co.,* 946 F.Supp. 1241 (M.D.La.1996).

7. *Subjectivity.* That is, the scientific method must be an objective one. This is the essence of what the Supreme Court referred to as scientific validity, also known as "falsifiability." It follows that if an expert's methodology cannot be explained in objective terms, and is not subject to be proven incorrect by objective standards, then the methodology is presumptively unreliable. For example, in *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.) *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994), plaintiff claimed that her cataracts were caused by exposure to nuclear radiation. Plaintiff called an ophthalmologist who testified to that effect and who based his conclusion on a visual inspection of the plaintiff's eyes. The expert testified that he could identify radiation-induced cataracts by simple visual observation. There was no scientific support for this premise, however, and defendant's experts demonstrated that a proper methodology for detecting radiation-induced cataracts included a medical work-up, a work-up of the patient's history, and an examination of occupation dosimetry charts. The court ruled that the testimony failed under *Daubert* because the expert employed a completely subjective approach that was rejected by other scientists, and which could not be proved false.

**1128**

2 Saltzburg, Martin & Kapra, Federal Rules of Evidence Manual, 1229–37 (7th Ed.1998).

## D. *Dr. Kilburn's Expert Testimony*

█ Dr. Kilburn's proposed expert testimony raises each of the seven red flags identified above as indicating that his expert testimony is unreliable. His methodology is known only to Dr. Kilburn, his extrapolation is from one chemical compound to entirely different chemicals with no known common properties, he bases his opinion on his experience with other chemical reactions, he relies upon the fact that plaintiff was exposed as a causal connection for the resulting injury, his methodology does not fit the facts of this case, he has failed to consider other possible causes, he has failed to test his hypothesis in any meaningful way, he reached his conclusions before he ever did any research, and his opinion cannot be explained in any objective terms. Dr. Kilburn's expert opinion is not only based upon his subjective analysis, it is essentially based upon his determination, without any scientific basis, that all injuries which occur after exposure to a chemical compound must be causally related to and result from the individual's exposure to chemicals.

In addition, Dr. Kilburn's proposed expert testimony does not comply with any of *Daubert's* factors to assess whether the opinion is based on sound scientific principles. Dr. Kilburn's theory has not been tested; his theory has not been subjected to peer review or publication; the potential rate of error has not been determined or applied; and his theory has not been generally accepted in the scientific community. Dr. Kilburn is obviously a well-qualified and well-meaning specialist in internal medicine and in preventive medicine and occupational health. As pointed out by the Fifth Circuit Court of Appeals in *Moore v. Ashland Chemical Inc.*, *supra*, however, "[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore v. Ashland Chemical Inc.*, 151 F.3d at 278 (*quoting from Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996)).

## E. *Defendant's Expert Testimony*

In fact, the evidence presented during the course of the *Daubert* hearing demonstrates that when proper methodology is employed, Dr. Kilburn's expert opinions amount to nothing more than a highly qualified expert rendering highly unscientific speculation in order to establish a causal connection between plaintiff's exposure to Rubiflex and his claimed injuries. While the focus of defendants' motion in limine must be upon Dr. Kilburn and defendants' attempt to exclude his expert testimony, an examination of defendants' expert testimony, as presented by Dr. Hubert H. Schaumburg, exposes the glaring deficiencies in Dr. Kilburn's methodology and conclusions. Dr. Schaumburg is professor and Chairman of Neurology at the Albert Einstein College of Medicine and his subspeciality is neurotoxicology, which is the study of the adverse effect of chemicals upon the nervous system. Dr. Schaumburg has edited the standard textbook used for teaching neurotoxicology and has authored over one hundred papers in this field.

Dr. Schaumburg testified that Dr. Kilburn's methodology violates four of the seven fundamental tenets of neurotoxicology. The first is the delay in the onset of two and one-half months following one exposure to the injury complained of by the plaintiff, the second is the requirement of repeated exposure to hazardous chemicals to produce any kind of persistent effect, the third is that neurotoxins do not affect only one side of the face and only one eye, and last of all, plaintiff was seen by an experienced neurologist shortly after his exposure and was found to have no neurological findings. Dr. Schaumburg testified that he has examined hundreds of cases of people exposed to solvents and the physical reaction to the solvents is very quickly manifested and it does not take two and

one-half months to develop a physical reaction. Chemicals do not produce any kind of persistent effect and do not affect only one side of the body.

When an individual is exposed to a neurotoxic substance which gains entry into the body, the toxic substance gets into the nervous system, circulates throughout the brain and the nerves, and involves the entire body. It does not produce a local effect. There is a very close temporal association between the symptoms of the victim and the exposure, and a delay of two and one-half months or more between the same is not recognized in any of the medical literature. A one time exposure that produces the results complained of by plaintiff is also not recognized in the medical literature, as is a reaction to only part of the body. Last of all, Dr. Schaumburg testified, the difference between the immediate deficit versus a progressive deficit is also not recognized in the medical literature. Moreover, Dr. Schaumburg pointed out, plaintiff was examined by a very well-qualified senior neurologist, Dr. William Paulsen, who found no neurological problem with the plaintiff except for his drooping lid and a complaint of headache. Dr. Paulsen's examination of the plaintiff took place two and a half months after plaintiff's exposure, and no neurological deficits were found at that time. Dr. Schaumburg expressed the opinion that plaintiff was examined by Dr. Paulsen at a time when his symptoms would have been very apparent and none were found.

Dr. Schaumburg further related that he is very familiar with the scientific literature in the field of neurotoxicology and there is nothing in the reported literature that would suggest that a single dose, very short-term exposure to an epoxy-like product would produce a delayed reaction and progressive reaction over a long period of time as that experienced by plaintiff.[7]

## IX.

### Conclusion

#### A. Defendants' Motion in Limine

After hearing Dr. Kilburn's testimony, the court was impressed with his sincerity, but the court must agree with the United States District Court for the Western District of Tennessee in *Nelson v. Tennessee Gas Pipeline Co., supra,* that Dr. Kilburn's expert opinions are based upon nothing more than conjecture, speculation, and litigation animus. Unfortunately, it appears that Dr. Kilburn has allowed his animosity toward the use of chemicals in the modern world to cloud his objectivity. As stated by the court in *Nelson,* "expert opinions are about science, however, not advocacy." *Nelson v. Tennessee Gas Pipeline Co.,* No. 95–112 (W.D.Tenn. Aug. 31, 1998). Accordingly, the motion filed by defendants seeking to exclude the testimony of plaintiff's expert, Kaye H. Kilburn, M.D. [Doc. 36] is **GRANTED.**

#### B. Defendant ICI Americas, Inc.'s Motion for Recovery of Costs

The leading case by the Sixth Circuit Court of Appeals construing the issue of whether and to what extent a court should impose sanctions is found in *Regional Refuse Systems, Inc. v. Inland Reclamation Co.,* 842 F.2d 150 (6th Cir.1988). Although this case deals with the imposition of sanctions pursuant to Rule 37, Federal Rules of Civil Procedure, it has general application to the imposition of sanctions under Rule 16(f), Federal Rules of Civil Procedure.[8] The factors identified by the Sixth Circuit in *Regional Refuse Systems*

---

**7.** In addition, Dr. Schaumburg testified that in his opinion as a neurologist and based upon his review of Dr. Kilburn's deposition, he did not believe that Dr. Kilburn was qualified to give an opinion about medical causation in a toxic chemical case such as the one at bar.

**8.** It is questionable whether this court could enforce sanctions against plaintiff or plain-

tiff's counsel for the failure of plaintiff's expert witness to show up for the *Daubert* hearing scheduled in this case unless plaintiff or his counsel procured his absence. Rule 16(f) is directed toward the conduct of a party or the party's attorney rather than third party witnesses. The rule stipulates that, "if a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made

**1130**

are as follows: (1) whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the party's failure to cooperate in discovery; (3) whether the party was warned that a failure to cooperate in discovery could lead to the sanctions; and (4) whether less drastic sanctions were first imposed or considered.

 In this case, Dr. Kilburn's failure to cooperate in discovery does not appear to be due to willfulness, bad faith, or fault. In addition, in view of the decision of this court to exclude the expert testimony of Dr. Kilburn, it does not appear that defendants have been substantially prejudiced by Dr. Kilburn's failure to cooperate in discovery, and Dr. Kilburn was not warned that a failure to cooperate in discovery could lead to sanctions. Moreover, less drastic sanctions were not first imposed or considered.

From the testimony presented by Dr. Kilburn at the evidentiary hearing, it is apparent that he was unaware that he would not be able to appear at the *Daubert* hearing in Knoxville, Tennessee until the night before the hearing was scheduled to be held. Therefore, it does not appear to the court that Dr. Kilburn's failure to be present for the *Daubert* hearing on April 30, 1999, was the fault of Dr. Kilburn, plaintiff or plaintiff's counsel, but due to circumstances beyond their control. Accordingly, the motion of defendant ICI Americas, Inc., for recovery of costs resulting from plaintiff's expert failing to appear at the scheduled *Daubert* hearing [Doc. 59] is **DENIED.**

**IT IS SO ORDERED.**

on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or upon the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)." The rule does not mention, however, failure of a party's witnesses to comply with the requirements of the Federal Rules of Civil Procedure.